IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON AT SEATTLE

ANIMAL INTELLIGENCE SOFTWARE, INC., a Washington corporation,

Plaintiff,

vs.

SARAH COLOMBINI OSBORN, DVM, an individual; and SOUTHWEST VETERINARY DERMATOLOGY, a Texas veterinary practice,

Defendants.

NO.

COMPLAINT FOR COPYRIGHT INFRINGEMENT, BREACH OF CONTRACT, AND DAMAGES

COMES NOW the Plaintiff, above named, by and through attorney Adriena Clifton of Clifton Law PLLC, and complains and alleges against the above-named Defendants as follows:

## I.    PARTIES

1.1    Plaintiff Animal Intelligence Software, Inc. ("AIS") is a Washington corporation with its principal place of business in Washington State. AIS develops, licenses, and supports proprietary veterinary practice management software.

1.2    Defendant Dr. Sarah Colombini Osborn, DVM ("Dr. Osborn") is an individual who owns and operates a veterinary practice known as Southwest Veterinary Dermatology, located at 18807 State Highway 249, Houston, Texas. Dr. Osborn may be served with process at this business address or through her attorney of record.

COMPLAINT - 1

CLIFTON LAW PLLC

PO Box 2862
Kirkland, WA 98083-2862
425.409.9625
www.cliftonlawpllc.com

1.3    Defendant Southwest Veterinary Dermatology ("Southwest Vet") is a veterinary dermatology practice owned and operated by Dr. Sarah Colombini Osborn, located at 18807 State Highway 249, Houston, Texas. Southwest Vet may be served with process at its place of business or through its owner.

## II.    VENUE AND JURISDICTION

2.1    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1338(a), as this action arises under the Copyright Act, 17 U.S.C. § 101 et seq. This Court also has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367, as well as diversity jurisdiction pursuant to 28 U.S.C. § 1332

2.2    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in this District, including the formation and execution of the License Agreement, Plaintiff's development and ownership of the copyrighted software, Plaintiff's principal place of business, and Plaintiff's discovery of the unauthorized use. Venue is also proper under 28 U.S.C. § 1400(a) as this action arises under the Copyright Act. This Court has personal jurisdiction over Defendants because they purposefully directed their activities toward Washington by entering into and performing under the License Agreement with a Washington corporation, and the claims arise out of those contacts with Washington.

## III.    FACTS

3.1    In 2004, Plaintiff AIS and Defendant Dr. Sarah Osborn executed a software license agreement (the "License Agreement") granting Dr. Osborn and Southwest Vet a non-exclusive, non-transferable, limited license to use AIS's proprietary Animal Intelligence Software on up to five (5) workstations. Attached as **Exhibit A** is a true and correct copy of this executed License Agreement.

COMPLAINT - 2

CLIFTON LAW PLLC

PO Box 2862
Kirkland, WA 98083-2862
425.409.9625
www.cliftonlawpllc.com

3.2     Under the License Agreement, AIS retained all title and ownership rights to the software. Upon termination or expiration of the license, the client was required to promptly cease all use of the software and return all copies of the software and related materials to AIS.

3.3     In conjunction with the License Agreement, Dr. Osborn and Southwest Vet also entered into a Client Support Policy/Agreement with AIS, which provided ongoing technical support and software maintenance for quarterly fees. See **Exhibit A.**

3.4     In 2011, AIS proposed a new support contract with revised pricing. The new contract represented an approximately 87% increase in support fees. TJ Driver from AIS management spoke directly with Dr. Osborn regarding her dissatisfaction with the price increase. Attached as **Exhibit B** is a true and correct copy of this proposed support contract.

3.5     In a letter dated January 2011, Dr. Osborn notified AIS in writing that she was cancelling her software support effective January 31, 2011. Dr. Osborn stated her opposition to the changes in the new contract and indicated she would not sign it, citing the material changes and significant increase in support fees. Attached as **Exhibit C** is a true and correct copy of the cancellation letter submitted by Dr. Osborn.

3.6     During a telephone call, TJ Driver informed Dr. Osborn that cancelling support would terminate her license agreement with AIS and that the software would have to be removed. Mr. Driver specifically explained that Dr. Osborn had purchased the rights to use the software, not to own it. Internal logs from AIS document that upon receiving Dr. Osborn's cancellation notice, the company explained that this action would trigger the termination of her software license and require the removal of all AIS software. Attached as **Exhibit D** is a true and correct copy of this telephone log.

3.7     In her cancellation letter, Dr. Osborn referenced the original 2004 agreement and expressed her belief that she could decline support fees and retain all rights and functionality of the software. Dr. Osborn asserted that her 2004 contract implied the software could be used without paying for ongoing support. See **Exhibit C.**

COMPLAINT - 3

3.8     Southwest Veterinary Dermatology made a final payment of $732.60 to AIS in January 2011 for the first quarter of 2011, which included the AI License Fee, support, and maintenance. However, the payment was later withdrawn due to a credit card dispute initiated by Dr. Osborn, which was processed on March 2011. Attached as **Exhibit E** is a true and correct copy of the invoice of which the $732.60 payment was later withdrawn, and the customer balance detail ledger indicating such.

3.9     Unbeknownst to AIS, Dr. Osborn and Southwest Vet continued to use the Animal Intelligence Software on five (5) workstations continuously from 2011 through at least January 2026, a period of approximately fourteen (14) years, without a valid license and without paying any support or licensing fees.

   a. AIS discovered the unauthorized software use in August 2025 when Dr. Osborn placed a support call to AIS regarding technical issues with the software. Dr. Osborn reported experiencing an "error 7017" with the Advantage Server and requested assistance with the scheduler module.

   b. On or about August 15, 2025, George Bala, an AIS support technician, spoke with Dr. Osborn, who confirmed she was using AI version 3.00 SR1 on five (5) workstations. During the call, Dr. Osborn requested a cost estimate to fix the scheduler. Mr. Bala explained to Dr. Osborn that the scheduler is part of the full Animal Intelligence software and she would need to become an active client again to use it.

   c. Brad Osterman, an AIS representative, subsequently contacted Dr. Osborn and informed her that her account had been cancelled in 2011, that the AI 3.x software series is no longer supported or sold, and that the AI software should have been returned to AIS upon cancellation. Mr. Osterman informed Dr. Osborn that her continued use of the software was unauthorized and that her clinic could not receive any support unless they became an active client again.

COMPLAINT - 4

d. Mr. Osterman provided Dr. Osborn with a verbal quote to reinstate her Animal Intelligence software license and advised that upgrading to the current cloud-based version would be beneficial. On August 25, 2025, AIS sent a formal written quote to Dr. Osborn for $6,670.00 to move to a cloud-based model with monthly support fees of $470.00. The quote included a one-time implementation fee of $1,750.00, a database upgrade fee of $4,500.00 (to address existing database errors), and a total monthly recurring fee of $520.00 for a 5-user AIGalaxy Cloud license.

e. On August 19, 2025, Dr. Osborn responded to the quote via email, stating: "We have opted to go with another system," thereby declining the offer to reinstate her Animal Intelligence software license. Mr. Osterman followed up with Dr. Osborn via phone call, text message, and email to ensure she received the quote, noting it would expire on August 25, 2025.

f. Attached as **Exhibit F** is a true and correct copy of the telephone support logs which evidence this exchange.

3.10    Despite Dr. Osborn's representation that her clinic had "opted to go with another system," Southwest Vet continued to actively use the Animal Intelligence software. On or about January 7, 2026, Brandon Whiting, an IT representative from Centric Technology Services working on behalf of Southwest Vet, called AIS customer support regarding a license error message (error code 7003) with the Animal Intelligence software. The representative indicated that all five licenses were being used. Attached as **Exhibit G** is a true and correct copy of the screenshot of the support ticket and email evidencing such.

3.11    Brad Osterman informed Brandon Whiting that Dr. Osborn's clinic had cancelled their service in 2011, was not an active client, should not be using the software, and therefore no support would be provided unless the clinic became an active client again. Mr. Osterman informed the AIS executive team that despite Dr. Osborn's claims of switching to

COMPLAINT - 5

CLIFTON LAW PLLC

PO Box 2862
Kirkland, WA 98083-2862
425.409.9625
www.cliftonlawpllc.com

another system, her clinic was still actively using the Animal Intelligence software as of January 7, 2026.

3.12    On or about September 2025, Becki L. Wheeler of Witherspoon Brajcich McPhee, PLLC, representing AIS, sent a demand letter to Dr. Osborn alleging unauthorized software use, breach of contract, and copyright infringement. The demand letter stated that Dr. Osborn's breach and infringement resulted in $63,567.82 in lost support revenue and $22,500.00 in lost upgrade fees, for a total of $86,067.82 in damages. Attached as **Exhibit H** is a true and correct copy of this demand letter.

3.13    Dr. Osborn responded to the demand letter, disagreeing with the claim of unauthorized use and stating she never received notification from AIS that cancelling support would terminate her license under the 2004 contract. Dr. Osborn asserted that she had "every right to use the software" and maintained her position that the 2004 contract allowed her to use the software without paying for ongoing support. Attached as **Exhibit I** is a true and correct copy of the email response from Dr. Osborn.

3.14    AIS, through its counsel, offered to settle all claims with Dr. Osborn for $100,000.00, with the offer open until September 15, 2025. Dr. Osborn declined this settlement offer.

3.15    Defendants have refused to compensate Plaintiff for the unauthorized use of its proprietary software, return the software, cease using the software, or otherwise resolve this matter, necessitating this lawsuit.

**IV.    FIRST CAUSE OF ACTION – BREACH OF CONTRACT (AGAINST ALL DEFENDANTS)**

4.1    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

4.2    Plaintiff and Defendants entered into a valid and enforceable software license agreement and client support agreement in 2004 (collectively, the "Agreement").

COMPLAINT - 6

CLIFTON LAW PLLC

PO Box 2862
Kirkland, WA 98083-2862
425.409.9625
www.cliftonlawpllc.com

4.3     Plaintiff performed all conditions required under the Agreement, including providing the licensed software, granting the limited license to use the software, and providing technical support through January 31, 2011.

4.4     Defendants breached the Agreement by:

a.  Failing to return all full or partial copies of the software and related materials upon termination of the Agreement in 2011 as required by the License Agreement;

b.  Continuing to use the software after termination of the license without authorization or payment of licensing fees;

c.  Using the software on five (5) workstations continuously from 2011 through at least January 2026 without a valid license; and

d.  Refusing to pay for reinstatement of the license, refusing to return the software, and refusing to cease using the software even after being notified of the unauthorized use.

4.5     As a direct and proximate result of Defendants' breach, Plaintiff has suffered damages including but not limited to $63,567.82 in lost support revenue, $22,500.00 in lost upgrade fees, and additional damages to be proven at trial.

## V.     SECOND CAUSE OF ACTION – COPYRIGHT INFRINGEMENT
### (AGAINST ALL DEFENDANTS)

5.1     Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

5.2     Plaintiff is the owner of all copyrights in the Animal Intelligence Software, which it created and developed, including the source code, object code, user interface, database structure, and related documentation. As the creator and copyright owner, AIS retained all title and ownership rights to the software, including all intellectual property rights. No ownership or copyright interest in the software was ever transferred to Defendants.

COMPLAINT - 7

CLIFTON LAW PLLC

PO Box 2862
Kirkland, WA 98083-2862
425.409.9625
www.cliftonlawpllc.com

5.3     Any license granted to Defendants in 2004 was limited, non-exclusive, and non-transferable, permitting use of the software only subject to ongoing compliance with the license terms and conditions, including payment of support fees.

5.4     The license granted to Defendants terminated in January 2011 when Dr. Osborn cancelled the support agreement. Upon such termination, Defendants were required to return all copies of the software and cease all use. Any use of the software after January 31, 2011 has been without authorization or license from Plaintiff.

5.5     Defendants have infringed Plaintiff's copyrights by continuing to reproduce the software in the random access memory (RAM) of five (5) computers, display the software on computer screens, and otherwise exercise exclusive rights reserved to the copyright owner, all without authorization, from 2011 through at least January 2026.

5.6     Defendants' infringement has been willful. Defendants were explicitly notified in 2011 that their license was terminated and that they were required to return the software. Despite this notice, and despite being notified again in August 2025 that their use was unauthorized, Defendants continued to use the software and asserted a purported right to do so.

5.7     As a direct result of Defendants' copyright infringement, Plaintiff has suffered and continues to suffer damages, including lost licensing fees, lost support revenue, and diminution in the value of its copyrighted work. Plaintiff is entitled to recover actual damages and Defendants' profits attributable to the infringement, or alternatively, statutory damages as provided by 17 U.S.C. § 504.

5.8     Plaintiff is entitled to injunctive relief pursuant to 17 U.S.C. § 502 requiring Defendants to immediately cease all use of the software, return or destroy all copies of the software, and refrain from any further infringement of Plaintiff's copyrights.

COMPLAINT - 8

CLIFTON LAW PLLC

PO Box 2862
Kirkland, WA 98083-2862
425.409.9625
www.cliftonlawpllc.com

## VI.     THIRD CAUSE OF ACTION – UNJUST ENRICHMENT (AGAINST ALL DEFENDANTS)

6.1     Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

6.2     Plaintiff conferred a benefit upon Defendants by providing valuable proprietary software that enabled Defendants to manage their veterinary practice, including client records, appointments, billing, and other essential practice management functions.

6.3     Defendants had knowledge of and appreciated this benefit, as evidenced by their continuous use of the software on five (5) workstations for approximately fourteen (14) years after termination of their license.

6.4     Defendants' retention of this benefit without payment is unjust and inequitable. Defendants received the full benefit of using sophisticated practice management software valued at $63,567.82 in support fees and $22,500.00 in upgrade fees, while paying nothing for such use over a fourteen-year period.

6.5     Plaintiff is entitled to restitution in an amount equal to the value of the benefit unjustly retained by Defendants, including but not limited to $86,067.82 in unpaid licensing and support fees, plus additional amounts to be proven at trial.

## VII.     DAMAGES

7.1     Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

7.2     As a direct and proximate result of Defendants' conduct, Plaintiff has suffered the following economic damages:

      a.   Lost support and maintenance revenue: $63,567.82;

      b.   Lost software upgrade fees: $22,500.00;

      c.   Lost profits and business opportunities;

      d.   Costs of investigating and discovering the unauthorized use; and

COMPLAINT - 9

7.3    Other economic damages to be proven at trial.

a.  For the copyright infringement claim, Plaintiff is entitled to elect, at any time before final judgment, to recover statutory damages pursuant to 17 U.S.C. 504(c) in an amount up to $150,000 per work infringed, given Defendants' willful infringement.

## VIII.   ATTORNEY'S FEES AND COSTS

8.1.    Plaintiff is entitled to an award of reasonable attorney's fees and costs pursuant to 17 U.S.C. 505 (Copyright Act), the terms of the License Agreement and Service Agreement, and any other applicable statute or rule of law.

## IX.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff Animal Intelligence Software, Inc. respectfully requests that this Court enter judgment in its favor and against Defendants as follows:

A.    For compensatory damages in an amount to be proven at trial, including but not limited to $86,067.82 in lost support revenue and upgrade fees, plus additional damages;

B.    In the alternative, for statutory damages pursuant to 17 U.S.C. 504(c) for willful copyright infringement in an amount up to $150,000 per work infringed;

C.    For a permanent injunction pursuant to 17 U.S.C. 502 requiring Defendants to immediately cease all use of Plaintiff's copyrighted software, return or destroy all copies of the software in their possession or control, and refrain from any further infringement;

D.    For pre-judgment and post-judgment interest as allowed by law;

E.    For reasonable attorney's fees and costs pursuant to 17 U.S.C. 505, the License Agreement, and any other applicable statute or rule of law;

COMPLAINT - 10

CLIFTON LAW PLLC

PO Box 2862
Kirkland, WA 98083-2862
425.409.9625
www.cliftonlawpllc.com

For such other and further relief as the Court deems just and equitable.

Respectfully submitted this 14th of April, 2026.

CLIFTON LAW PLLC

By: */s/ Adriena X. Clifton*
    Adriena Clifton, WSBA No. 61477
Attorney for Plaintiff

COMPLAINT - 11

*EXHIBIT A*

# Implementation Pricing & Contract Information

### Prepared for:

## SW Veterinary Dermatology

### Today's Date: October 12, 2004

### Intended Deadline for Acceptance: October 12, 2004

## Contents

The following documents included in this packet form an integrated contract that shall be binding after the Software License is executed:

- Initial Software, Implementation & Support Costs

- Explanation of Software, Implementation & Support Costs

- Implementation & Training Plan

- Client Support Policy

- Configuration & Payment Terms

- Software License

Appendix A: Client Support Policy/Service Contract

# Initial Software, Implementation & Support Costs[1]

## Prepared for:

### SW Veterinary Dermatology Clinic
### Dr. Sarah Osborn

SOFTWARE LICENSE FEES

|  | License Fee |
|---|---|
| Animal Intelligence Core System:  5-User License* | $ 4500 |
| Electronic Medical Records | $ 2100 |
| Special 10% IVECCS Discount | $(660) |
| Software License Total | $ 5940 |

\* This license user count allows up to 5 concurrent workstation logins to the database at one time.

INSTALLATION, MODULES & SUPPORT COSTS[2]

|  | Rate $/hr | # Hours | Cost |
|---|---|---|---|
| Installation Services | $73 | 16 | $ 1168 |
| Macro System Administrator Training Tuition | N/A | N/A | $ 1000 |
| On-Site Application Training[2] | $ 120 | 16 | $ 1920 |
| Annual Software Maintenance & Client Support (12 months, plus 2 months free) | N/A | N/A | $ 1300 |
| AI Ledger Linx | N/A | N/A | $595 |
| Services Total |  |  | $ 5983 |

TOTAL INITIAL COSTS

| Total Initial Costs | $ 11,923 |
|---|---|

---

[1] All costs are published Animal Intelligence Software, Inc. 2004 rates and are subject to change.
[2] Costs shown do not include travel and related travel expenses. Travel expenses incurred will be billed to the client at actual cost.

## Explanation of Software, Implementation & Support Costs

**Animal Intelligence (AI) Software License**
This license allows a practice to use AI on a specified number of workstations. This also includes a license to use the Advantage Database Server manufactured by Extended Systems on a specified number of workstations. The Advantage database is the foundation upon which AI is built and is a primary reason for its reliability and stability.

**Installation Services**
The installation of the AI system is significantly more complex than simply loading software. Hardware and network systems need to be verified, data needs to be converted or manually entered, and consultation and training needs to take place. In addition, we find that many practices take this opportunity to fine tune some practice operations. You will be assigned a personal implementation manager who will oversee these steps and keep track of the "who, what, when, where, and why" of your installation. This person will interact with your practice, AIS personnel, vendors and anyone else involved in the installation, to ensure the smoothest transition possible. Your Implementation Manager will work with you to help you assess your system, work with your hardware/network vendor, and offer guidance, to help you make decisions that are right for you and your practice.

For new AIS clients, our staff will manually enter such information as your referring veterinarians, referring hospitals, inventory, and zip codes. For VSS to AI conversion clients our staff will convert such data as your client, patient, veterinarian, and hospital information, medical records, basic inventory information, zip codes, and reminders.

*Animal Intelligence Core System:* Your Implementation Manager will work with you to help customize your estimate and invoice forms, your referral letters, and other reports and communication pieces that you utilize in your practice.
*Animal Intelligence Core System plus Electronic Medical Records:* Your Implementation Manager will work with your Macro Administrator (see Macro Administrator Training below) to help customize your Electronic Medical Records system, in addition to the above Core System customization. If you desire more complicated macros or would like our staff to create your macros, additional service time can be purchased.

**Macro System Administrator Training**
When Electronic Medical Records is purchased, one of your staff members (usually a non-veterinarian) will attend the 2-day Macro Administrator training at our AIS Training Center in Silverdale, Washington. This individual will then serve as a liaison between the practitioner(s), and the Animal Intelligence system, in designing macros to customize the following: estimate and invoice forms, referral letters, other reports and communication pieces that you use in your practice, and your medical records system. If your clinic would like more than one person to attend this class, there is a 40% discount for any additional persons.

Any attendees who have attended this macros class can attend the class at our corporate offices again at no tuition cost as space is available

**On-Site Application Training**
An AIS trainer will come to your facility for a minimum of two days and train staff members on the day-to-day operations (adding clients and patients, invoicing, accounting, etc.) of the Animal Intelligence system. All trainer travel expenses will be billed to you after the training at exact cost. If weekend training is required there will be an additional charge per day.

**Annual Software Maintenance & Client Support**
Software maintenance entitles the licensee to any changes, upgrades, etc. in the product or services. This is crucial as new features and enhancements are being added frequently. Client Support entitles the licensee to client assistance as outlined in our Client Support Agreement & Policy. This initial maintenance and support is for the first 12 months, plus 2 additional months for free (providing 14 months of support and maintenance for the cost of 12 months).

- 5 -

# Implementation & Training Plan

Investing in the Software is the beginning of a long-term relationship between you and Animal Intelligence Software, Inc. Consultation, training, hardware recommendations, and client support are all parts of the continuing relationship we want to build with you and your staff. We can help your practice run smoother, faster and smarter.

The following is a general timeline describing the process of integrating the Software into your practice. Your assigned Implementation Manager will stay in close contact with you during this implementation process to ensure your satisfaction with training and services.

### Stage 1 Implementation Planning
- We will send you the InstallPack portion of the Software — a workbook that helps you gather referring veterinarian, hospital and inventory data for pre-entry by AIS.
- Your assigned Implementation Manager will call to discuss your objectives and expectations.
- Your Implementation Manager will work with you to review vendor hardware and network proposals, and make recommendations for your individual practice.
- You will complete and return the InstallPack portion of the Software to AIS for data-entry.
- We will schedule your 2-day System Administrator Training in Silverdale, WA.

### Stage 2 Hardware/Software Installation and Testing
- Your network vendor will order, install, and test all hardware and software.

### Stage 3 Macro System Administrator Training
- Your selected staff member(s) will attend the 2-day System Administrator training at our AIS Training Center in Silverdale, WA.

### Stage 4 Macro Assistance
- Your Implementation Manager will work with you to help customize forms, referral letters, and reports that you use in your practice.
- If you purchased Electronic Medical Records, your Implementation Manager will work with your System Administrator to help design and implement your medical records system.

### Stage 5 On-Site Training
- After your network is confirmed to be functional, we will schedule your on-site training.
- One of our trainers will visit your facility for a minimum of two days to train you and your staff on the daily operations of the Software.
- Most clients allow one week to practice using the Software before "going live."

### Stage 6 Go Live
- Your Implementation Manager will follow up with you and your on-site trainer to try and ensure that everyone is comfortable and confident with the Software.
- Our Client Services Department will now become your main contacts and assist you with all your needs regarding the software and any needed supplies.

## Client Support Policy

The purpose of this document found in Appendix A of this document is to give you a clear and concise description of what you can expect from Client Support at AIS.

## Configuration & Payment Terms

**Number of Users and Included Modules**
This proposal and the fees stated include a five-user (5-user) license for the Software modules listed on the "Initial Software, Implementation & Support Costs" page.

**Please specify a LAN or WAN configuration:**

**LAN Configuration**
You are purchasing the Software for a standard local area (LAN) network configuration that has a dedicated NT/Windows 2000 (preferably) or NetWare server. The Software may be operated on a single computer network located at one physical site. The maximum number of concurrent users is listed on the "Initial Software, Implementation & Support Costs" page, and in the first paragraph above. Regardless of how many computer workstations are connected to the network, no more than this number of workstations may be simultaneously connected to the Software's database.

*Please initial here if you are implementing a LAN* ___SCO___

## OR:

**WAN Configuration**
You are purchasing the Software for a wide area network (WAN) configuration, which allows two or more physically separate practice locations to share the same database. The Software may be operated on a single wide area network. The maximum number of concurrent users is listed on the "Initial Software, Implementation & Support Costs" page, and in the first paragraph above. Regardless of how many computer workstations are connected to the network, no more than this number of workstations may be simultaneously connected to the Software's database. There will be a 35% surcharge applied to the current Client Support and Maintenance fees for WANs.

*Please initial here if you are implementing a WAN* _____

**Payment Terms**
Your total estimated cost is $11,923. This includes license fees, training, support and maintenance for the first year, as specified on the "Initial Software, Implementation & Support Costs" page. Costs shown do not include travel and travel-related expenses for AIS personnel and/or your staff for on-site or off-site training. Costs incurred will be billed to you at actual cost.

An initial payment of $7154 is due upon execution of this contract. The remaining $4769 will be due within three months of the execution of this contract. All amounts not paid when due will accrue interest at the rate of 1.5% per month, or the maximum amount allowed by applicable law, whichever is less. If payment is not received in accordance with the above payment schedule, AIS will require the Software be removed from your computers and all documentation returned to AIS.

**Expiration Dates:**

**Annual Software Maintenance and Client Support:**
The client support cost that is part of the initial costs of the software has the following additional terms. The initial annual support is for the first 14 months of your installation. The 14-month period begins the date that AI is initially installed on at least one workstation at your practice. After the initial 14-month period, you will be billed monthly at the current published support and maintenance fees.

**On-Site Training:**
The on-site training portion of your contract will expire 13 months after the date that this contract is accepted. If training has not occurred within that time frame, there will be a 25% penalty applied to the training fee of the initial contract. This penalty will be applied after on-site training has been completed and will be due upon receipt.

**Macro System Administrator Training:**
The Macro System Administrator training portion of your contract will expire 13 months after the date that this contract is accepted. If training has not occurred within that time frame, there will be a 25% penalty applied to the training fee of the initial contract. This penalty will be applied after the training has been completed and will be due upon receipt.

**Implementation Management:**
The Implementation Management portion of your contract will expire 13 months after the date that this contract is accepted. If the software installation has not been implemented within that time frame, there will be a 25% penalty applied to the Implementation costs of this initial contract. This penalty will be applied after implementation is complete. Additionally, the client will be responsible for paying the current monthly client support fees past the 13-months initial support and maintenance.

**Contract Review**
It is imperative that you carefully review this contract. If you are unclear about the features of the Software, the implementation process, training, or other services, please contact your sales representative. AIS can only honor what is in writing. If you have specific requirements that AIS is required to fulfill, these must be clearly stated in this contract. No refunds or returns after 10 days of receipt of contract. Refund requests within 10 days must be submitted in writing.

## ANIMAL INTELLIGENCE SOFTWARE, INC.
### Software License

This Software License is part of this integrated contract between Animal Intelligence Software, Inc. ("AIS") and the undersigned individual or organization indicated below ("Client").

## 1.    DELIVERY AND GRANT OF LICENSE

AIS shall provide Client with the Software pursuant to the "Implementation and Training Plan" page.

(a) Upon the delivery of the Software to the Client and during the existence of this contract, AIS grants to Client a limited, non-exclusive, non-transferable license to install and use one copy of the executable code (i.e. object code form) of the Software on a single CPU, or on multiple CPU's provided that all installed copies access only one source of data on a central server residing on Client's premises. All other rights not expressly granted to Client hereunder are hereby reserved to AIS. Client shall not rent, lease, sell, sublicense, assign, or otherwise transfer the Software, or any part thereof. Client may not reverse engineer, decompile or disassemble or otherwise modify, adapt, change or alter the Software except to the extent that applicable law expressly prohibits this restriction. AIS and its suppliers shall retain title and all ownership rights to the Software.

(b) If the Client violates Section 1(a) or 2, this contract is immediately terminated. In addition, either party may terminate this contract if the other party is in breach of any other provision of this contract, and the other party does not cure such breach within 30 days after receiving written notice thereof. Upon termination or expiration of this contract, Client shall promptly return to AIS all full or partial copies of the Software and related materials provided by AIS. Sections 1, 2, 4, 5, 6, and 7 shall survive termination or expiration of this contract.

(c) Software maintenance, client support, and training are covered in other pages of this contract.

**2. CONFIDENTIALITY:** Client agrees that it will hold in strictest confidence, and will not use or disclose to any third party, any confidential information of AIS. The term "confidential information of AIS" shall mean all non-public information that AIS designates as being confidential, or which, under the circumstances of disclosure ought to be treated as confidential. "Confidential information of AIS" includes, without limitation, the terms and conditions of this contract, the Software, information relating to business policies or practices of AIS, customers or suppliers of AIS, or information received from others that AIS is obligated to treat as confidential. If Client has any questions as to what comprises such confidential information, Client agrees to consult with AIS. "Confidential information of AIS" shall not include information that was known to Client prior to AIS's disclosure to Client, or information that becomes publicly available through no fault of Client.

**3. SECURITY PRECAUTIONS:** Client agrees to initiate and perform on a reasonable schedule data security procedures to assure the integrity of the Software and all data associated with or derived from the Software. It is recommended that backups of all data files be produced on a daily basis, these backups be kept in a safe place, and at least one current backup tape (made no more than 7 days prior to the current day) be kept at a completely separate and secure location from the business address where the computer physically resides. Although the Software is designed to create and maintain electronic medical records, AIS recommends that all data be printed and stored for additional backup purposes unless the client routinely verifies backup integrity.

**4. DISCLAIMER OF WARRANTY AND LIMITATION OF LIABILITY FOR SOFTWARE AND SERVICES. ALL SOFTWARE AND SERVICES PROVIDED BY AIS ARE DEEMED ACCEPTED BY CLIENT AND ARE PROVIDED "AS IS" AND WITH ALL FAULTS WITHOUT WARRANTY OF ANY KIND. TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW AIS FURTHER DISCLAIMS ALL WARRANTIES AND GUARANTEES, INCLUDING WITHOUT LIMITATION ANY EXPRESS OR IMPLIED (IN LAW OR IN FACT), WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE AND NONINFRINGEMENT. TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, IN NO EVENT SHALL AIS OR ITS SUPPLIERS BE LIABLE FOR ANY CONSEQUENTIAL, INCIDENTAL, INDIRECT, SPECIAL, PUNITIVE, OR OTHER DAMAGES WHATSOEVER (INCLUDING, WITHOUT LIMITATION, DAMAGES FOR LOSS OF BUSINESS PROFITS, BUSINESS INTERRUPTION, LOSS OF BUSINESS**

-9-

INFORMATION, COVER, OR OTHER PECUNIARY LOSS) ARISING OUT OF THIS CONTRACT OR THE USE OF OR INABILITY TO USE THE SOFTWARE OR SERVICES, EVEN IF AIS HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

INITIALS *SCO*

**5. GOVERNING LAW; ATTORNEYS' FEES.** The laws of the State of Washington shall govern this contract. Client further consents to jurisdiction by the state and federal courts sitting in Kitsap County, Washington, and waives any objections based on venue or inconvenient forum. If either AIS or Client employs attorneys to enforce any rights arising out of or relating to this contract, the prevailing party shall be entitled to recover reasonable attorneys' fees and other fees associated with such proceedings including, but not limited to, discovery costs and expert fees.

**6. ENTIRE AGREEMENT AND WAIVER.** This contract constitutes the complete and exclusive agreement between AIS and Client with respect to the subject matter hereof, and supersedes all prior oral or written understandings, communications or agreements not specifically incorporated herein. The parties agree that if any provisions of this contract shall be determined to be void by any court of competent jurisdiction, then such determination shall not affect any other provisions of this contract and all such other provisions shall remain in full force and effect, and it is the intention of the parties hereto that the provisions of this contract shall not be negatively construed against either party. This contract may not be modified except in writing duly signed by an authorized representative of AIS and Client. AIS shall not be deemed to have waived any rights hereunder unless such rights are expressly waived in writing.

**7. PARTIES BOUND AND ASSIGNMENT.** If "Client Name" is filled in below, then the individual signing this contract represents that he/she has authority to execute this contract on behalf of such company and agrees that the Software (and any copies thereof) shall remain on the company premises, unless otherwise agreed by AIS. Client shall not assign this contract or its rights or obligations hereunder to any third party without AIS' prior written consent.

SW VETERINARY DERMATOLOGY
SARAH C. OSBORN
Client Name

Animal Intelligence Software, Inc

Signed this ___10___ of ___2004___
Month                    Year

Signed this _20 October_ of _2004_
Month                    Year

At _BELLAIRE, TEXAS_
City, State

At _Silverdale, WA_
City, State

_Sarah C. Osborn_
Client (Sign)

_Shannon Driver_
By (Sign)

_SARAH C. OSBORN, PRESIDENT_
Name and Title (Print)

_SHANNON DRIVER, PRES/CEO_
Name and Title (Print)

## Appendix A:    Client Support Policy/Service Contract

The purpose of this document is to give clients a clear and concise description of what can be expected from Client Support at AIS, Inc.

**1.    Description of Service:**
Service agreement covering Animal Intelligence™ (herein called Software) support and maintenance.

**2.    Schedule of Services:**
The AIS staff assists in three primary areas as part of this support and maintenance agreement.

### I.    Standard Client Support

Standard Client Support coverage assists you in correcting minor problems, hardware upgrade assistance, server replacement issues, reinstalling software, modifying existing macros after you have been trained on the features of the Software, and fine tuning the Software to suit your practice.   Issues that are usually covered under Standard Client Support include correction of residual installation related issues such as printer configuration, Software configuration, general questions on Software functionality, concerns about areas that do not seem to perform as expected, and emergency situations such as lockups and inability to print.  Also included can be sending a replacement report or macro file in case of loss (accidental deletion), or making minor changes to standard macros and reports.

Standard Client Support hours for AI are 7:00 a.m. to 5:00 p.m. Pacific Time, Monday through Friday. These support hours are subject to change.  After the initial 14-months covered as part of your Initial Costs in your original purchase contract, Client Support is billed at the current monthly rates, and is required in order for clients to receive support and maintenance on the Software.

AI Clients who decline to pay monthly support fees on the Software will not be supported.  See Charges section for more details and requirements.

### II.    Emergency Paging

Standard Client Support for AI Clients includes after-hours paging incidents provided that it is a true emergency and this service is not abused.  Paging fees will be charged at the discretion of AIS if the foregoing guidelines are not followed and/or there is excessive and unreasonable use of after-hours services.  Abuse will be deemed at the discretion of AIS staff. Clients who abuse this service will be warned in writing of abuse.

### III.    Maintenance of Software (Updates and releases)

Client support for Software updates and releases of AI deemed necessary and/or beneficial shall be provided at no charge during AIS, Inc. normal business hours Monday through Friday or via the AIS, Inc. web site.
Animal Intelligence Software, Inc. (AIS) agrees to maintain the Software in good condition and provide releases to current, non-delinquent clients as part of this Service Agreement.

Animal Intelligence Software, Inc. hereby agrees to provide maintenance and support services for AI products and modules for the Client's license agreement user count at the current rates set forth in this schedule of services in accordance with the definitions. This is subject to the terms and conditions of the Animal Intelligence Software, Inc. Service Agreement as specified herein. Below are the current 2004 fees and monthly rates for AI. (Note: 35% surcharge is applied on WANs.) Fees subject to change.

| Number of users/systems | Total fees | Monthly rate |
|---|---|---|
| 1-user | $900.00 | $75.00 |
| 5-user | $1,300.00 | $108.33 |
| 10-user | $1,800.00 | $150.00 |
| 15-user | $2,400.00 | $200.00 |
| 25-user | $3,000.00 | $250.00 |
| 50-user | $3,600.00 | $300.00 |

### a.  Terms:

This agreement is effective from the date at which it is accepted by Animal Intelligence Software, Inc. and shall remain in force.

Thirty (30) days prior to the expiration date, Animal Intelligence Software, Inc. shall remit to the Client a renewal notice of the Service Agreement stating any changes to the terms, conditions or charges governing the renewal of this Agreement.

### b.  Charges:

If notification of intent not to extend this Agreement is received from the Client in writing after the expiration date of the Agreement, the client will be charged in the following manner for all services provided beyond the date at the prevailing rates.

Any clients who have not contracted for support for over one (1) year must pay a reinstatement fee which includes all back support fees up to one (1) year from date of termination. Additionally, a release fee of a minimum of $300 may be charged to assess the Client's current situation to get the Client's system up to current operating parameters. This fee will be charged at the discretion of AIS Client Support staff and/or the AIS Director of Operations. In such cases, all fees must be paid in advance before support will be rendered. Support for non-contracted support can be provided at the rate of $250 per incident plus the reinstatement fee and release fee if applied with a credit card (VISA or MasterCard) guarantee. If support is required for non-contractual clients after AIS business hours, Clients will also be charged the current after hours paging fee for each incident. An incident is defined as an occurrence or event. Incidents will be closed when AIS Client Support staff renders a final decision, or two days from initiation, whichever comes first. Emergency support fees may NOT be deducted from the reinstatement or renewal fees.

Clients not current on monthly support and not on the current version of the Software will be charged fifty percent (50%) the cost of the current software list price in order to be upgraded to the most current version.

### c.  Other Services:

If a Client requests service is performed/provided outside the normal Schedule of Services, Animal Intelligence Software, Inc. will furnish these services at the hourly rate and/or component rates and terms then in effect. Below are the services available but not limited to.

### I.  Enhancement Services

Enhancement Services include creating new macros, and reports (i.e., designing any new documents such as medical record macros, general communications or customized reports). These services are to assist you in getting the most out of the Software. It is our goal to get all the items you need completed such as customized reports, estimates and invoices, referral letters, and other communication pieces under the initial time budgeted for Installation Services. However, each practice's circumstances are unique and we need to allow for your individual situation. Time used for these services will be deducted from the time allotted in this contract for Installation Services. Once your pre-paid Installation Services hours have been exhausted, you will be billed at the current hourly rate for any additional Enhancement Services needed. Time and cost estimates will be provided by AIS for such services prior to services being rendered.

### II.  Special Projects

Special Projects are sometimes necessary to assist you with the Software. If it is determined by AIS client support that your request will take a substantial amount of time and falls outside of the scope of Standard Client Support and/or Enhancement Services, you will be informed that your request needs to be treated as a Special Project. Special Projects will be billed at the current rate from start to completion of the project. Examples of Special Projects would be extensive or complicated medical records macro design, extensive retraining on any skill, function or procedure that was previously trained on either during on-site training or at macros training (and such training was supported by documentation), extensive or complicated accounting issues, etc.

### III.    Training

Training is defined by AIS as teaching a new skill, function or procedure in order to use the Software. Training is covered under this contract in three areas: System Administrator training, On-Site training and/or one-on-one training.

3.    **Administrative Issues:**

a. **Invoicing**

The Service Agreement payment will be due by the 15th of each month. It will be considered late after the 30th of the month and a 1.5% service fee will be assessed on late payments.

Charges for services not covered by this Agreement will be invoiced separately at the time of the occurrence. Payment is due within thirty (30) days of the date of the invoice.

If invoices are not paid ninety (90) days after the date of the invoice, Animal Intelligence Software, Inc. reserves the right to discontinue service to the Client and send such accounts to collection.

b. **Taxes**

Client shall pay all taxes, including sales and use taxes applicable resulting from this Agreement or any activities hereunder, exclusive of taxes based on net income.

c. **Causes Beyond Control**

Animal Intelligence Software, Inc. is not responsible for failure to fulfill its obligations under this Agreement from causes beyond its control.

d. **Proprietary Information**

No title or ownership of software is transferred to the Client. The Software products are merely licensed to the Client solely for use in their practice, and must be used within terms of the original license agreement.

Supporting documentation supplied by Animal Intelligence Software, Inc. contains Animal Intelligence Software, Inc. proprietary information. This information is not to be duplicated or disclosed to a third party, not used for any purpose other than operation and maintenance of the Software products, without written consent from Animal Intelligence Software, Inc.

e. **Entire Agreement**

This Agreement contains the entire service understanding between the parties. Any amendment or modification of this Agreement will not affect this Agreement unless it is in writing and signed by the parties hereto.

f. **Governing Law**

This Agreement shall be interpreted, construed and governed under the laws of the State of Washington.

g. **Disclaimer and Limitation of Liability**

Animal Intelligence Software, Inc. in no event will be liable for lost profits or other consequential damages resulting from failure to perform as specified in this Agreement. Furthermore, Animal Intelligence Software, Inc. assumes no liability for personal injury or property damage from activities pursuant to this Agreement.

*I acknowledge I have read and understand the above Client Support Policy/Agreement and accept the above definitions and terms as part of this integrated contract.*

Signed: _Sarah C. Osborn_     Date: _10/12/04_

Name: _SARAH C OSBORN_

Title: _PRESIDENT_

Practice Name: _SOUTHWEST VETERINARY DERMATOLOGY_

Practice Address: _19311 STATE HWY. 249_

City, State: _HOUSTON, TX_   Zip: _77070_ Phone: _281-894-8151_

*EXHIBIT B*

# ANIMAL INTELLIGENCE SOFTWARE, INC.
## Software License and Support Agreement

This Software License is part of this integrated contract between Animal Intelligence Software, Inc. ("AIS") and the undersigned individual or organization indicated below ("Client"). This SOFTWARE LICENSE AND SUPPORT AGREEMENT describes the terms and conditions pursuant to which AIS, Inc. shall license to Client and support AI Software products (as defined below).

**1.    DEFINITIONS**

**1.1    CONFIDENTIAL INFORMATION**: Confidential information of AIS, Inc. shall mean all non-public information that AIS designates as being confidential, or which, under the circumstances of disclosure ought to be treated as confidential. Confidential information includes all of the terms of this Agreement, all its Schedules, any addenda hereto signed by both parties, all Software listings, Documentation, information, data, drawings, benchmark tests, specifications, trade secrets, object code and machine-readable copies of the Software, source code relating to the Software, and any other proprietary information supplied to the Client by AIS, Inc., including all items defined as confidential information.

**1.2    DOCUMENTATION:** Documentation manes any on-line help files, instruction manuals, operating instructions, user manuals, and specifications provide by AIS, Inc. which describe the use of the Software products and which either accompany the Software or are provided to the Licensee at any time.

**1.3    SOFTWARE:** Software means the computer software programs specified in Schedule A and otherwise provided to the Client pursuant to this Agreement.

**2.    DELIVERY AND GRANT OF LICENSE**

AIS shall provide Client with the software attached hereto as Schedule A (hereinafter the "AI Software"). Client expressly understands and agrees that the AI Software does not include any of the separate, yet integrated Animal Intelligence modules that are available for purchase separately from this Software License pursuant to a separate license agreement for each module.

**2.1    LIMITED NON-EXCLUSIVE NON-TRANSFERABLE LICENSE.**  Upon the delivery of the AI Software to the Client and during the existence of this contract, AIS grants to Client a limited, non-exclusive, non-transferable license to install and use one licensed copy of the executable code (i.e. object code form) of the AI Software with a specified user count on a single CPU at a single location, or on multiple CPUs provided the licensed user count is not exceeded, at one agreed upon and a specified Client site location, provided that all installed licensed copies of the AI Software access only one source of data on a central server residing on Client's premises. All other rights not expressly granted to Client hereunder are hereby reserved to AIS. Client shall not rent, lease, sell, sublicense, assign, or otherwise transfer the Software, or any part thereof without the prior express written consent of AIS. Client may not reverse engineer, decompile or disassemble or otherwise modify, adapt, change or alter the Software except to the extent that applicable law expressly prohibits this restriction. AIS and its suppliers shall retain title and all ownership rights to the Software. In the event that Client sells the practice and the purchaser fails to comply with AIS's requirements concerning the AI Software and/or related licensing, the purchaser shall not be entitled to use, modify, or

**CONFIDENTIAL**                                        1

Client Initials _____

otherwise alter the database associated with the Software. The license use will be retained by the original Client, and all provisions of this Agreement will remain in force.

**2.2**    **TERMINATION**. If the Client violates Section 2.1, or 3, this contract is immediately terminated. In addition, either party may terminate this contract if the other party is in breach of any other provision of the contract, and the other party does not cure such breach within 30 days after receiving written notice thereof. Upon termination or expiration of this contract, Client shall promptly return to AIS all full or partial copies of the Software and related materials provided by AIS. Sections 2, 3, 4, 5, 6, 7, and 8 shall survive termination or expiration of this contract.

**2.3**    **SOFTWARE MAINTENANCE, SUPPORT, AND TRAINING**.  Software maintenance, client support, and training are covered in other sections of this contract and are considered portions of the entire Agreement with AIS, Inc.

**2.4**    **PROPRIETARY INFORMATION**. No title or ownership of Software is transferred to the Client. The Software products are only licensed to the Client solely for use in their business, and must be used within the terms of the license agreement. Supported documentation supplied by AIS contains AIS proprietary information. This information is not to be duplicated or disclosed to a third party, and not used for any purpose other than operation and maintenance of the AI Software products without written consent from AIS, Inc. authorized officials.

**3.**    **CONFIDENTIALITY:**

**3.1.**    Client agrees that it will hold in strictest confidence, and will not use or disclose to any third party, any confidential information of AIS. The term "confidential information of AIS" shall mean all non-public information that AIS designates as being confidential, or which, under the circumstances of disclosure ought to be treated as confidential. "Confidential information of AIS" includes, without limitation, the terms and conditions of this contract, the Software, information relating to business policies or practices of AIS, customers or suppliers of AIS, or information received from others that AIS is obligated to treat as confidential. This also includes AIS documentation and support information deemed proprietary under Section 2.4 above. If Client has any questions as to what comprises such confidential information, Client agrees to consult with AIS. "Confidential information of AIS" shall not include information that was known to Client prior to AIS' disclosure to Client, or information that becomes publicly available through no fault of Client. Each party agrees to exercise due care in protecting the Confidential Information from unauthorized use and disclosure. Furthermore, it is understood that the terms of this Agreement reflect consideration received by the Client in return for being an adopter of the Software, and that AIS, Inc. future revenue potential could be adversely affected if terms were to become publicly known. Therefore, in addition to not disclosing the terms of this Agreement, the parties shall make no statement to any third party, which tend to indicate the substance of the terms (for example, "we got a great deal, it was a bad deal for them"). However, neither party bears any responsibility for safeguarding information that (a) is publicly available, (b) already in the other party's possession and not subject to a confidentiality obligation, (c) obtained by the other party from third parties without restrictions on disclosure, (d) independently developed by the other party without reference to Confidential Information, or (e) required to be disclosed by order of a court or other governmental entity. Nothing herein will prevent routine discussions by the parties that normally take place in a "user group" context.

**CONFIDENTIAL**                                        2


Client
Initials    _____

**3.2.** **INJUNCTIVE RELIEF**. In the event of actual or threatened breach of the provisions of Section 3.1, the non-breaching party will have no adequate remedy at law and will be entitled to immediate and injunctive and other equitable relief, without bond and without the necessity of showing actual money damages.

4. **MAINTENANCE AND SUPPORT.** Client agrees to pay License and Support Fees according to Schedule A as attached hereto for each Site as specified in Schedule A. As long as Client is current in the payment of all license and support fees, with respect to each site, Client will be entitled to License and Support for each site as set forth in Schedule A attached hereto. Failure to pay maintenance fees with respect to any Site shall be deemed a material breach of this Agreement and in such event, AIS, Inc. shall have the right to terminate the rights granted hereunder with respect to such site.

5. **SECURITY PRECAUTIONS:** Client agrees to initiate and perform on a reasonable schedule data security procedures to assure the integrity of the AI Software and all data associated with or derived from the AI Software. Security precautions include regular and complete backups of all data files be produced on a daily basis, these backups be kept in a safe place, and at least one current backup copy (made no more than 7 days prior to the current day) be kept at a completely separate and secure location from the business address where the computer physically resides. Although the Software is designed to create and maintain electronic medical records, AIS, Inc. also recommends that all one additional copy of data be stored in another media fashion for additional backup purposes unless the client routinely verifies backup integrity with a third party software. The AIS Backup feature is NOT to be considered a part of this security precaution. AIS, Inc. is not responsible for data loss on Client's system.

6. **DISCLAIMER OF WARRANTY AND LIMITATION OF LIABILITY FOR SOFTWARE AND SERVICES. ALL SOFTWARE AND SERVICES PROVIDED BY AIS ARE DEEMED ACCEPTED BY CLIENT AND ARE PROVIDED "AS IS" AND WITH ALL FAULTS WITHOUT WARRANTY OF ANY KIND. TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, AIS FURTHER DISCLAIMS ALL WARRANTIES AND GUARANTEES, INCLUDING ,WITHOUT LIMITATION, ANY EXPRESS OR IMPLIED (IN LAW OR IN FACT) WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE AND NONINFRINGEMENT. TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW. IN NO EVENT SHALL AIS OR ITS SUPPLIERS BE LIABLE FOR ANY CONSEQUENTIAL, INCIDENTAL, INDIRECT, SPECIAL, PUNITIVE, OR OTHER DAMAGES WHATSOEVER (INCLUDING, WITHOUT LIMITATION, DAMAGES FOR LOSS OF BUSINESS PROFITS, BUSINESS INTERRUPTION, LOSS OF BUSINESS INFORMATION, COVER, OR OTHER PECUNIARY LOSS) ARISING OUT OF THIS CONTRACT OR THE USE OF OR INABILITY TO USE THE SOFTWARE OR SERVICES,EVEN IF AIS HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.**

7. **CLIENT INDEMIFICATION.** Client shall indemnify and hold AIS, Inc. harmless from and against any costs, losses, liabilities, and expenses (including reasonable attorney's fees) arising out of third party claims related the Client's Use of the Software under this Agreement.

8. **TERMS AND TERMINATION**. This Agreement will begin on the effective date that the signed Agreement from the Client is received at the AIS, Inc. offices and will continue in effect for an initial term of one (1) year ("Initial Term"). After the Initial Term, this Agreement will automatically renew for additional one (1) year periods (each, a "Renewal Term") unless this

**CONFIDENTIAL** 3

Client Initials _____

Agreement is terminated as hereinafter provided. Either party may terminate this Agreement prior to the end of the Initial Term or any Renewal Term by giving the other party not less than ninety (90) days prior written notice of intent to terminate. Upon termination, Client agrees to pay for any of the Services ordered prior to termination and, if applicable, to discontinue use of the Software by destroying or returning to AIS, Inc. via tracked delivery form all computer disks and other copies thereof.

9. **GOVERNING LAW; COLLECTION AND ATTORNEYS' FEES.** The laws of the State of Washington shall govern this contract. Client further consents to jurisdiction by the state and federal courts presiding in Kitsap County, Washington, and waives any objections based on venue or inconvenient forum. If either AIS or Client employs attorneys to enforce any rights arising out of or relating to this contract, the prevailing party shall be entitled to recover reasonable attorneys' fees and other fees associated with such proceedings including, but not limited to, discovery costs and expert fees. In the event of nonpayment by Client, AIS may refer the matter to collections, at which time AIS shall be entitled to recover any associated collection fees and costs from Client.

10. **ENTIRE AGREEMENT AND WAIVER.** This contract constitutes the complete and exclusive agreement between AIS and Client with respect to the subject matter hereof, and supersedes all prior oral or written understandings, communications or agreements not specifically incorporated herein. The parties agree that if any provisions of this contract shall be determined to be void by any court of competent jurisdiction, then such determination shall not affect any other provisions of this contract and all such other provisions shall remain in full force and effect, and it is the intention of the parties hereto that the provisions of this contract shall not be negatively construed against either party. This contract may not be modified except in writing duly signed by an authorized representative of AIS and Client. AIS shall not be deemed to have waived any rights hereunder unless such rights are expressly waived in writing.

11. **PARTIES BOUND AND ASSIGNMENT.** If "Client Name" is filled in below, then the individual signing this contract represents that he/she has authority to execute this contract on behalf of such company and agrees that the Software (and any copies thereof) shall remain on the company premises, unless otherwise agreed by AIS. Client shall not assign this contract or its rights or obligations hereunder to any third party without prior written consent by AIS corporate officer(s) and payment of current applicable fees for a License Transfer Agreement.

| | |
|---|---|
| _____ | Animal Intelligence Software, Inc. _____ |
| Client Name | |
| Signed this _____ of _____ | Signed this _____ of _____ |
| Day      Month/Year | Day      Month/Year |
| At_____ | At Port Orchard, Washington _____ |
| _____ | _____ |
| Client Signature | T.L. Driver Signature |
| _____ | _____ |
| Name and Title (Print) | T.L. Driver, PhD, President/CEO |

**CONFIDENTIAL**                    4

Client Initials _____

# Schedule A: Client Support Policy/Service Contract

The purpose of this document is to give clients a clear and concise description of what can be expected from Client Support at AIS, Inc.

**1.**      **Description of Service:**

Service agreement covering the product Animal Intelligence (herein called AI Software) and AI Modules software license and support fees. The service is governed by this agreement as long as a current Software License and Support Agreement is in place between Animal Intelligence Software, Inc. ("AIS") and the client ("Client") specified in the Software License and Support Agreement.

**2.**      **Schedule of Services:**

The AIS staff assists Clients in three primary areas as part of this Software License and Support Agreement.

### I.      Standard Client Support

Standard Client Support coverage is in place to assist Clients with correcting minor AI Software problems, hardware upgrade assistance, reinstalling AI Software and/or AI Modules (as covered in the Software License and Support Agreement), modifying existing macros after Client has been trained on the features of the AI Software, and fine tuning the AI Software and/or AI modules to suit the practice. Issues that are typically covered under Standard Client Support include correction of residual installation related issues such as printer configuration, Software configuration issues, general questions on Software functionality, concerns about areas that do not seem to perform as expected, and emergency situations such as lockups and inability to print. Also included can be sending a replacement report or replacement macro file in case of loss (accidental deletion), and/or making minor changes to standard macros and reports.

Standard Client Support hours for AIS, Inc. are 7:00 a.m. to 5:00 p.m. Pacific Time, Monday through Friday, excluding nationally recognized holidays. These support hours are subject to change. After the initial months covered as part of the Initial Costs in the original purchase contract, Software License and Support Fees are billed at the current quarterly, semi-annual, or annual rates. Client Software License and Support payments and contracts are required in order for clients to receive ANY support and maintenance on the AI Software.

AI Clients who decline to pay Software License and Support fees on the AI Software will not be supported. See Charges section (III (b) for more details and requirements.

### II.      Emergency Paging

Standard Client Support for AI Clients includes after-hours paging incidents provided incidents are true emergencies and this service is not abused. Paging fees will be charged at the discretion of AIS if the foregoing guidelines are not followed and/or there is excessive and unreasonable use of after-hours services. Abuse will be deemed at the discretion of AIS staff. Clients who abuse this service will be warned in writing of abuse. Abuse is considered calling for routine issues that are NOT of an emergent nature or do not affect the operation of the business.

### III.      Maintenance of Software (Updates and Releases)

Client License and fees support for AI Software updates and releases of AI Software (excluding software modules) deemed necessary and/or beneficial shall be provided at no charge during AIS, Inc. normal

**CONFIDENTIAL**                                          5

Client Initials    _____

business hours Monday through Friday as scheduled or via the AIS, Inc. website. AIS agree to maintain the AI Software in good condition and provide releases to current, non-delinquent clients as part of this Software License and Support Agreement. AI modules releases and updates are NOT supplied without cost as a part of the Software License and Support Agreement. AI Modules releases and updates incur update and release fees at the current AIS rates.

AIS hereby agrees to provide maintenance and support services for AI Software for the Client's Software License and Support Agreement user count at the current rates set forth in this schedule of services in accordance with the definitions, and pay support for AI modules for the Client's licensed copy of a specified AI module. This is subject to the terms and conditions of the Animal Intelligence Software, Inc. Software License and Support Agreement as specified herein. The current 2011 fees and monthly rates for AI are as of the date of execution. (Note: 45% surcharge is applied on WANs.)  **Fees are <u>subject to change at any time</u>**.

**a.** **Terms and Termination.**  This agreement is effective from the date at which it is accepted by Animal Intelligence Software, Inc. and shall remain in force until terminated in accordance with this Agreement.

**b.** **Termination.**  This Agreement, unless written cancellation request is received ninety (90) days prior to the desired cancellation date remains in effect with automatic annual renewal. Any written cancellation request without ninety (90) days notice, Client will be expected to pay the current quarterly support and maintenance fee in full. Client upon 90 days prior written notice to AIS, Inc., with or without cause, does not entitle the Client to a refund or any portion of the Software License or Support fees.

AIS, Inc. upon written notice to Client if any of the following events ("Termination Events") occur, no such termination will entitle Client to ANY refund of any portion of the License Fee or Support fees; (a) Client fails to pay any undisputed amount due to AIS, Inc. within thirty (30) days after AIS, Inc. gives the Client written notice of such non-payment; (b) Client is in material breach of any non-monetary terms, condition, or provision of the Agreement, which breach, if capable of being cured, is not cured within thirty (30) days after AIS gives Client written notice of such breach; or (c) Client becomes subject to any bankruptcy, or insolvency proceedings under federal or state statutes.

**c.** **Effects of Termination**. If any Termination Event occurs, termination will become effective immediately or on the date set forth in the written notice of termination. Termination of this Agreement will not affect the provisions regarding Clients' or AIS, Inc. treatment of Confidential Information, provisions relating to the payment of amounts due, or provisions limiting or disclaiming AIS, Inc.'s liability, which provisions will survive termination of this Agreement. Within fourteen (14) days after the termination or discontinuance of this Agreement for any reason whatsoever, Client shall return the Software, derivative works, and all copies thereof, in whole or in part, all related Documentation and all copies thereof, and any other Confidential Information in its possession. Client shall furnish AIS, Inc. with a certificate signed by an executive officer of Client verifying that the same has been completed.

**d .** **Charges.**  If notification of intent to cancel this Agreement is received from the Client in writing, the client will be charged and liable for all services available and provided before the notification was received.

*1.* **Reinstatement Fee.**  Any clients who have not contracted for AI Software License and Support during a calendar year (12 months) must pay a reinstatement fee. The reinstatement fee includes a base administration fee of

**CONFIDENTIAL**                                                6

$550, plus any outstanding monthly client support fees and <u>up to one (1) year of client support paid in advance.</u>

2. **Release Fee:** Additionally, a release fee of $375 will be charged to assess the Client's current technology situation to get the Client's system to current AI operating parameters. Clients not on the current version of AI will be charged seventy-five percent (75%) of the current list cost of the current AI version for upgrading. AIS, Inc. cannot restore clients to previous versions of AI.

3. **Fee Terms:** All fees must be paid in advance before any support will be rendered. Payment may be made by credit card, ACH, PayPal, or check. If check payment is made, the check must clear or funds must be verified before ANY services will be rendered.

<u>e.</u>    **Other Services.**  If a Client requests service is performed/provided outside the normal Schedule of Services, Animal Intelligence Software, Inc. will furnish these services at the current hourly rate and/or component rates and terms then in effect. The services available, but not limited to include:

### IV.    Enhancement Services/Macro Specialist Services

Enhancement Services include creating new macros and reports (i.e., designing any new documents such as medical record macros, general communications, or customized reports). These services are to assist Clients in getting the most out of the AI Software. It is the goal of AIS, Inc. to get all the items Clients need completed such as customized reports, estimates and invoices, referral letters, and other communication pieces under the initial time budgeted for Installation Services. However, each circumstance is unique and AIS, Inc. will allow for

individual situations. Time used for these services will be deducted from the time allotted in this contract for Installation Services if available. If no Installation Services hours remain (Installation hours expire one (1) year of date of installation, the Client will be billed at the current hourly rate for any additional Enhancement Services needed. Time and cost estimates will be provided by AIS for such services prior to services being rendered.

### V.    Special Projects

Special Projects are sometimes necessary to assist Clients with the AI Software. If it is determined by AIS client support administrators that your request will take a substantial amount of time and falls outside of the scope of Standard Client Support and/or Enhancement Services, Clients will be informed that such request needs to be treated as a Special Project. Special Projects will be billed at the current rate from start to completion of the project based on the types of services rendered. Examples of Special Projects would be extensive or complicated medical records macro design, extensive retraining on any skill, function or procedure that was previously trained on either during on-site training or at macros training (and such training was supported by documentation), extensive or complicated accounting issues, special programming, server migration, combining databases, network configuration support, etc.

### VI.    Training

Training is defined by AIS as teaching a new skill, function or procedure in order to use the AI Software or AI Modules. Training is covered under this contract in three areas: System Administrator training, On-Site training, one-on-one training, and/or AI Module training. Training can occur in three ways by mutual agreement. AIS, Inc. will provide the best recommendation for Client's practice and needs. Methods include on-site, at AIS Training Institute, or online.

**CONFIDENTIAL**                    7                    Client Initials  _____

3.    **Administrative Issues:**

a.    **Invoicing and Default.** Software License and Support Agreement payments shall be received at AIS Inc. by the 10th of each month. It will be considered late after the 10th of the month and an 18% service fee will be assessed on late payments.

Charges for services not covered by this Software License and Support Agreement will be invoiced separately at the time of the occurrence as outlined in aforementioned Sections IV, V and VI of Schedule A above. Full payment is due within fifteen (15) days of the date of the invoice to avoid any suspension or cancellation of support and initiations of collections.

If invoices are not paid forty-five (45) days after the date of the invoice, Animal Intelligence Software, Inc. reserves the right to discontinue service to the Client and send such accounts to collection immediately for remedy. Clients not current on Software License and Support are governed by the terms of this Agreement in Sections III(a), III(b), and III(c) in Schedule A. In addition, in such circumstances, the license to use the Software shall automatically be revoked and, upon demand by AIS, Inc. Client shall return any and all copies and originals of the Software to Animal Intelligence Software, Inc., and shall cease and desist using the Software and any modules. This shall include removing all copies of the Software from Client's system. Client's performance of these requirements shall be completed at Client's sole expense. Client shall furnish AIS, Inc. with a certificate signed by an executive officer of Client verifying that the same has been completed.

b.    **Taxes.**  Client shall pay all taxes, including sales and use taxes applicable resulting from this Software License and Support Agreement or any activities hereunder, exclusive of taxes based on net income.

c.    **Causes Beyond Control (Force Majeure).** Animal Intelligence Software, Inc. is not responsible for failure to fulfill any obligations under this Agreement from causes beyond its control. Under no circumstances will either party be liable for failure or delay in connection with this Agreement if the failure or delay is due to circumstances beyond control including, without limitation, acts of any governmental body, war, insurrection, sabotage, embargo, fire, flood, strike or other labor disturbance, interruption of or delay in transportation, unavailability of, interruption or delay in the Internet, telecommunication or third party services, failure of third party software or hardware, or inability to obtain raw materials, supplies, or power used in equipment needed for the provision of the Services.

d.    **Proprietary Information.** No title or ownership of AI Software or AI modules is transferred to the Client. The AI Software products are merely licensed to the Client solely for use in their practice, and must be used within terms of the license agreement.

Supporting documentation supplied by AIS, Inc. contains Animal Intelligence Software, Inc. proprietary information. This information is not to be duplicated or disclosed to a third party, not used for any purpose other than operation and maintenance of the AI Software products, without written consent from authorized signatory officers at AIS, Inc..

e.    **Entire Agreement.** This Agreement contains the entire service understanding between the parties. Any amendment or modification of this Agreement will not affect this Agreement unless it is in writing and signed by the parties hereto. Further, any mutually agreed upon and signed amendments or modifications of this agreement will only affect that specified area of the Agreement, and not the Agreement in whole.

**CONFIDENTIAL**                                          8

Client Initials _____

**f.**    **Governing Laws.** The laws of the State of Washington shall govern this Agreement. Any dispute concerning a breach of, or dispute concerning, this Agreement, shall be litigated in Kitsap County Superior Court, State of Washington, and each party hereto consents to personal jurisdiction in Kitsap County Superior Court, State of Washington. Client further waives any objections based on venue or inconvenient forum. If either AIS or Client employs attorneys to enforce any rights arising out of or relating to this Agreement, the prevailing party shall be entitled to recover reasonable attorneys' fees and other fees associated with such proceedings including, but not limited to, discovery costs and expert fees. In the event of nonpayment by Client, AIS may refer the matter to collections, at which time AIS shall be entitled to recover any associated collection fees and costs from Client.

**g.**    **Entire Agreement And Waiver.** This Agreement constitutes the complete and exclusive agreement between AIS and Client with respect to the subject matter hereof, and supersedes all prior oral or written understandings, communications or agreements not specifically incorporated herein. The parties agree that if any provisions of this contract shall be determined to be void by any court of competent jurisdiction, then such determination shall not affect any other provisions of this contract and all such other provisions shall remain in full force and effect, and it is the intention of the parties hereto that the provisions of this contract shall not be negatively construed against either party.

This contract may not be modified except in writing duly signed by an authorized representative of AIS and Client. AIS shall not be deemed to have waived any rights hereunder unless such rights are expressly waived in writing.

**h.    Disclaimer and Limitation of Liability**

Animal Intelligence Software, Inc. in no event will be liable for lost profits or other consequential damages resulting from failure to perform as specified in this Agreement. Furthermore, Animal Intelligence Software, Inc. assumes no liability for personal injury or property damage from activities pursuant to this Agreement.

**i.    Collections and Attorneys' Fees and Costs.**

In the event of a dispute concerning this agreement, the prevailing party is entitled to recover their reasonable attorneys' fees and costs incurred. In the event of nonpayment by Client, Animal Intelligence Software, Inc. may refer the matter to collections, at which time Animal Intelligence, Inc. shall be entitled to recover any associated collection fees and costs from Client.

*I acknowledge I have read and understand the above Software License and Support Agreement and accept the above definitions and terms as part of this integrated contract.*

Signed: _____ Date:_____

Name:_____

Title:_____

Practice Name:_____

Practice Address:_____

City, State: _____ Zip _____ Phone: _____

**CONFIDENTIAL**                    9                    Client Initials _____

This serves as a legal binding agreement...." **THIS SOFTWARE LICENSE AND SUPPORT AGREEMENT** (this "Agreement") is entered into between Animal Intelligence Software, Inc., a Washington State corporation, ("AIS, Inc. or "We" or "Us" or "Our"), and You, the Client (the "Client" or "You" or "Your"). **THIS AGREEMENT CONSISTS OF THIS ENTIRE AGREEMENT AND THE AIS, INC. STANDARD TERMS AND CONDITIONS.  SIGNING THIS AGREEMENT INDICATES CLIENT'S ACCEPTANCE OF ALL OF THE TERMS AND CONDITIONS OF THIS AGREEMENT.**

*Client Certification:*
I certify that I have read and understand the terms set forth herein and in the AIS, Inc. Standard Terms and Conditions, I am authorized to legally bind the Client identified above to the terms as written, and I agree to the terms as written on behalf of the Client identified above**.**

**I FURTHER UNDERSTAND AND AGREE ON BEHALF OF THE CLIENT THAT (I) THE DISCLAIMERS OF WARRANTIES AND LIMITATIONS OF LIABILITY CONTAINED IN THE AIS, INC. STANDARD TERMS AND CONDITIONS ARE AGREED TO AND CONSTITUTE AN INTEGRAL PART OF THIS AGREEMENT, AND (II) WE ARE ENTITLED TO RELY UPON THE CERTIFICATIONS OF CLIENT STATED IN THE CLIENT TERMS AND CONDITIONS, INCLUDING OBLIGATIONS RELATING TO INFORMATION STATED THEREIN**. A fax transmission of this form is intended to bind Client to the terms hereof. AIS, Inc will not be bound until an authorized representative of AIS, Inc. executes this Agreement.**

Signed: _____ Date:_____

Name: _____

Title:_____ _____

**CONFIDENTIAL**                           10                    Client
                                                                  Initials  _____

# *EXHIBIT C*



SARAH COLOMBINI OSBORN, DVM
Diplomate American College
of Veterinary Dermatology

January 19, 2011

Animal Intelligence Software, Inc
P.O. Box 554
Port Orchard, Washington  98366



Re: Change in contract terms

To Whom It May Concern:

Under the terms of my original agreement dated October 20, 2004, it clearly states that "AI clients who decline to pay monthly support fees on the Software will not be supported". It then goes on to state what would be required to reinstate support if required at a later date. In the new contract that I received January 2, 2011, you are attempting to force material changes to the agreement by stating that "failure to pay software license and support fees respective to any site shall be deemed a material breach of the AI License agreement, and AIS can terminate the rights of the licensee to use the AI software". I do not agree with these changes and, therefore, will not sign the new contract. The increase in your support fees of 87 % in one year are an indication that your company does not value or respect it's clients. My discussion of this matter on January 5, 2010, with T.J. in your financial department was further evidence that your company is no longer concerned with providing good client service. If this is the way that you plan to conduct business, then I no longer wish to continue being supported by your company. Therefore, I am cancelling support as of January 31, 2011, and under the terms of my original contract, I expect to retain all rights and functionality of the Animal Intelligence Software.

Sarah Colombini Osborn
Southwest Veterinary Dermatology

*EXHIBIT D*

## *Incident Summary*

Client     1149 SW Veterinary Dermatology
Incident  31650 billing issue

| Date / Time | Time | Employee | Description |
|---|---|---|---|
| 1/6/2011 9:17:03 AM | 15 | TJ Driver | Create Incident |

Called Dr. Osborn. She said she is upset with the new pricing because it has gone up nearly 100%. I explained to her that before a 5 user was 131.08, and in the past support pricing never factored in the cost of supporting modules becuase modules were not being updated nor were we receiving a lot of support for them. However during this last year we have released several updates and experience high call volumes for support on modules, which was reflected in the 2011 pricing. She expressed her disatisfaction with us and that it is not right to charge them that much, especially since they only call twice a year. i told her i am looking at there incident history and see multiple incidents going back to 2006, so it is way more than twice a year. She said that she wanted to talk to someone higher in management to disucss this to explain their justification. i told her this is as high as you can get as i am management. she asked about cancelling support. i told her by cancelling support she effectively terminates her license agreement with AI and subsequently it would have to be removed. She said that she purchased the software. I explained again she only purchased the rights to use it, not own it, and by cancelling support, AI would have to be removed. She said that we are raping them and putting them in a noose. I explained this is standard proprietary software standard. She said goodbye and ended the call.

*EXHIBIT E*

Animal Intelligence Software, Inc.

PO Box 554
Port Orchard, WA 98366

# Invoice

| Date | Invoice # |
|------|-----------|
| 2/16/2011 | 18310 |

**PAID**
**03/01/2011**

| Bill To |
|---------|
| *SW Veterinary Dermatology #1149 |
| 19311 State Hwy 249 |
| Houston, TX 77070 |

| P.O. No. | Terms |
|----------|-------|
| 1st Qtr 2011 | net 10th |

| Quantity | Description | U/M | Rate | Amount |
|----------|-------------|-----|------|--------|
| 3 | AI License Fee (includes support and maintenance) | | 244.20 | 732.60 |

| | |
|---|---|
| **Total** | $732.60 |
| **Payments/Credits** | -$732.60 |
| **Balance Due** | $0.00 |

For billing questions, please call (360) 876-7123

E-mail

financedepartment@animalintelligence.com

| Phone # | 360-876-7123 |
|---------|--------------|

8:08 PM

03/24/26

# Animal Intelligence Software, Inc.
## Customer Balance Detail
### As of March 1, 2011

| Type | Date | Num | Account | Class | Amount | Balance |
|---|---|---|---|---|---|---|
| **#1149 SW Veterinary Dermatology #1149** | | | | | | 0.00 |
| Invoice | 10/13/2004 | 6924 | Accounts Receivable | | 11,923.00 | 11,923.00 |
| Payment | 10/13/2004 | | Accounts Receivable | | -7,154.00 | 4,769.00 |
| Invoice | 11/22/2004 | 7075 | Accounts Receivable | | 648.19 | 5,417.19 |
| Invoice | 01/03/2005 | 7224 | Accounts Receivable | | 1,185.77 | 6,602.96 |
| Payment | 02/01/2005 | | Accounts Receivable | | -648.19 | 5,954.77 |
| Payment | 04/08/2005 | | Accounts Receivable | | -2,977.39 | 2,977.38 |
| Payment | 05/06/2005 | | Accounts Receivable | | -2,977.38 | 0.00 |
| Invoice | 01/03/2006 | 8987 | Accounts Receivable | | 108.33 | 108.33 |
| Payment | 01/03/2006 | | Accounts Receivable | | -108.33 | 0.00 |
| Invoice | 02/02/2006 | 9138 | Accounts Receivable | | 108.33 | 108.33 |
| Payment | 02/02/2006 | | Accounts Receivable | | -108.33 | 0.00 |
| Invoice | 03/01/2006 | 9293 | Accounts Receivable | | 108.33 | 108.33 |
| Payment | 03/01/2006 | | Accounts Receivable | | -108.33 | 0.00 |
| Invoice | 04/03/2006 | 9447 | Accounts Receivable | | 108.33 | 108.33 |
| Payment | 04/03/2006 | | Accounts Receivable | | -108.33 | 0.00 |
| Invoice | 05/01/2006 | 9593 | Accounts Receivable | | 108.33 | 108.33 |
| Payment | 05/01/2006 | | Accounts Receivable | | -108.33 | 0.00 |
| Invoice | 05/04/2006 | 9676 | Accounts Receivable | | 112.22 | 112.22 |
| Payment | 05/31/2006 | 36604... | Accounts Receivable | | -112.22 | 0.00 |
| Invoice | 06/01/2006 | 9749 | Accounts Receivable | | 108.33 | 108.33 |
| Payment | 06/01/2006 | | Accounts Receivable | | -108.33 | 0.00 |
| Invoice | 07/01/2006 | 9900 | Accounts Receivable | | 108.33 | 108.33 |
| Payment | 07/01/2006 | | Accounts Receivable | | -108.33 | 0.00 |
| Invoice | 08/01/2006 | 10048 | Accounts Receivable | | 119.16 | 119.16 |
| Payment | 08/01/2006 | | Accounts Receivable | | -119.16 | 0.00 |
| Invoice | 09/01/2006 | 10199 | Accounts Receivable | | 119.16 | 119.16 |
| Payment | 09/01/2006 | | Accounts Receivable | | -119.16 | 0.00 |
| Invoice | 10/02/2006 | 10344 | Accounts Receivable | | 119.16 | 119.16 |
| Payment | 10/02/2006 | | Accounts Receivable | | -119.16 | 0.00 |
| Invoice | 11/01/2006 | 10490 | Accounts Receivable | | 119.16 | 119.16 |
| Payment | 11/01/2006 | | Accounts Receivable | | -119.16 | 0.00 |
| Invoice | 12/01/2006 | 10638 | Accounts Receivable | | 119.16 | 119.16 |
| Payment | 12/01/2006 | | Accounts Receivable | | -119.16 | 0.00 |
| Invoice | 01/02/2007 | 10860 | Accounts Receivable | | 119.16 | 119.16 |
| Payment | 01/02/2007 | | Accounts Receivable | | -119.16 | 0.00 |
| Invoice | 02/01/2007 | 11014 | Accounts Receivable | | 119.16 | 119.16 |
| Payment | 02/01/2007 | | Accounts Receivable | | -119.16 | 0.00 |
| Invoice | 03/01/2007 | 11161 | Accounts Receivable | | 119.16 | 119.16 |
| Payment | 03/01/2007 | | Accounts Receivable | | -119.16 | 0.00 |
| Invoice | 04/02/2007 | 11220 | Accounts Receivable | | 119.16 | 119.16 |
| Payment | 04/02/2007 | | Accounts Receivable | | -119.16 | 0.00 |
| Invoice | 05/01/2007 | 11360 | Accounts Receivable | | 119.16 | 119.16 |
| Payment | 05/01/2007 | | Accounts Receivable | | -119.16 | 0.00 |
| Invoice | 05/29/2007 | 11465 | Accounts Receivable | | 114.73 | 114.73 |
| Payment | 05/31/2007 | | Accounts Receivable | | -119.16 | -4.43 |
| Invoice | 06/01/2007 | 11591 | Accounts Receivable | | 119.16 | 114.73 |
| Invoice | 07/01/2007 | 11659 | Accounts Receivable | | 119.16 | 233.89 |
| Payment | 07/01/2007 | | Accounts Receivable | | -119.16 | 114.73 |
| Payment | 07/20/2007 | 98747... | Accounts Receivable | | -114.73 | 0.00 |
| Invoice | 08/01/2007 | 11801 | Accounts Receivable | | 119.16 | 119.16 |
| Payment | 08/01/2007 | | Accounts Receivable | | -119.16 | 0.00 |
| Invoice | 09/01/2007 | 11952 | Accounts Receivable | | 119.16 | 119.16 |
| Payment | 09/01/2007 | | Accounts Receivable | | -119.16 | 0.00 |
| Invoice | 10/01/2007 | 12091 | Accounts Receivable | | 119.16 | 119.16 |
| Payment | 10/02/2007 | | Accounts Receivable | | -119.16 | 0.00 |
| Invoice | 11/01/2007 | 12260 | Accounts Receivable | | 119.16 | 119.16 |
| Payment | 11/01/2007 | | Accounts Receivable | | -119.16 | 0.00 |
| Invoice | 12/01/2007 | 12403 | Accounts Receivable | | 119.16 | 119.16 |
| Payment | 12/01/2007 | | Accounts Receivable | | -119.16 | 0.00 |
| Invoice | 01/01/2008 | 12547 | Accounts Receivable | | 119.16 | 119.16 |
| Payment | 01/01/2008 | | Accounts Receivable | | -119.16 | 0.00 |
| Invoice | 02/01/2008 | 12777 | Accounts Receivable | | 119.16 | 119.16 |
| Payment | 02/01/2008 | | Accounts Receivable | | -119.16 | 0.00 |
| Invoice | 03/03/2008 | 12842 | Accounts Receivable | | 119.16 | 119.16 |
| Payment | 03/03/2008 | | Accounts Receivable | | -119.16 | 0.00 |
| Invoice | 04/01/2008 | 13065 | Accounts Receivable | | 119.16 | 119.16 |
| Payment | 04/01/2008 | | Accounts Receivable | | -119.16 | 0.00 |

8:08 PM

03/24/26

# Animal Intelligence Software, Inc.
## Customer Balance Detail
### As of March 1, 2011

| Type | Date | Num | Account | Class | Amount | Balance |
|------|------|-----|---------|-------|--------|---------|
| Invoice | 05/01/2008 | 13121 | Accounts Receivable | | 119.16 | 119.16 |
| Payment | 05/01/2008 | | Accounts Receivable | | -119.16 | 0.00 |
| Invoice | 06/02/2008 | 13262 | Accounts Receivable | | 119.16 | 119.16 |
| Payment | 06/02/2008 | | Accounts Receivable | | -119.16 | 0.00 |
| Invoice | 06/03/2008 | 13347 | Accounts Receivable | | 118.08 | 118.08 |
| Payment | 06/23/2008 | 1217 | Accounts Receivable | | -118.08 | 0.00 |
| Invoice | 07/01/2008 | 13413 | Accounts Receivable | | 119.16 | 119.16 |
| Payment | 07/01/2008 | | Accounts Receivable | | -119.16 | 0.00 |
| Invoice | 08/01/2008 | 13639 | Accounts Receivable | | 119.16 | 119.16 |
| Payment | 08/01/2008 | | Accounts Receivable | | -119.16 | 0.00 |
| Invoice | 09/01/2008 | 13777 | Accounts Receivable | | 119.16 | 119.16 |
| Payment | 09/02/2008 | | Accounts Receivable | | -119.16 | 0.00 |
| Invoice | 10/01/2008 | 13847 | Accounts Receivable | | 119.16 | 119.16 |
| Payment | 10/01/2008 | | Accounts Receivable | | -119.16 | 0.00 |
| Invoice | 11/01/2008 | 13989 | Accounts Receivable | | 119.16 | 119.16 |
| Payment | 11/01/2008 | | Accounts Receivable | | -119.16 | 0.00 |
| Invoice | 12/01/2008 | 14213 | Accounts Receivable | | 119.16 | 119.16 |
| Payment | 12/02/2008 | Dece... | Accounts Receivable | | -119.16 | 0.00 |
| Invoice | 12/04/2008 | 14222 | Accounts Receivable | | 36.45 | 36.45 |
| Invoice | 12/29/2008 | 14277 | Accounts Receivable | | 119.16 | 155.61 |
| Payment | 12/29/2008 | Jan 2... | Accounts Receivable | | -119.16 | 36.45 |
| Payment | 01/26/2009 | 00121... | Accounts Receivable | | -36.45 | 0.00 |
| Invoice | 01/30/2009 | 14420 | Accounts Receivable | | 119.16 | 119.16 |
| Payment | 01/30/2009 | Feb 2... | Accounts Receivable | | -119.16 | 0.00 |
| Invoice | 02/20/2009 | 14507 | Accounts Receivable | | 259.06 | 259.06 |
| Invoice | 02/28/2009 | 14542 | Accounts Receivable | | 131.08 | 390.14 |
| Payment | 02/28/2009 | March... | Accounts Receivable | | -131.08 | 259.06 |
| Invoice | 03/31/2009 | 14788 | Accounts Receivable | | 131.08 | 390.14 |
| Payment | 03/31/2009 | April 2... | Accounts Receivable | | -131.08 | 259.06 |
| Payment | 04/27/2009 | 00214... | Accounts Receivable | | -259.06 | 0.00 |
| Invoice | 05/01/2009 | 14859 | Accounts Receivable | | 131.08 | 131.08 |
| Payment | 05/01/2009 | 22608N | Accounts Receivable | | -131.08 | 0.00 |
| Payment | 05/15/2009 | 00236... | Accounts Receivable | | -259.06 | -259.06 |
| Invoice | 06/01/2009 | 15000 | Accounts Receivable | | 131.08 | -127.98 |
| Invoice | 07/01/2009 | 15135 | Accounts Receivable | | 131.08 | 3.10 |
| Payment | 07/01/2009 | 067458 | Accounts Receivable | | -131.08 | -127.98 |
| Invoice | 08/03/2009 | 15280 | Accounts Receivable | | 131.08 | 3.10 |
| Payment | 08/03/2009 | 069276 | Accounts Receivable | | -131.08 | -127.98 |
| Invoice | 09/07/2009 | 15424 | Accounts Receivable | | 131.08 | 3.10 |
| Payment | 09/07/2009 | 051542 | Accounts Receivable | | -131.08 | -127.98 |
| Invoice | 10/01/2009 | 15563 | Accounts Receivable | | 131.08 | 3.10 |
| Invoice | 11/02/2009 | 15723 | Accounts Receivable | | 131.08 | 134.18 |
| Payment | 11/02/2009 | 006854 | Accounts Receivable | | -131.08 | 3.10 |
| Invoice | 11/02/2009 | 15846 | Accounts Receivable | | 0.00 | 3.10 |
| Payment | 12/01/2009 | 012674 | Accounts Receivable | | -131.08 | -127.98 |
| Invoice | 12/02/2009 | 15987 | Accounts Receivable | | 131.08 | 3.10 |
| Invoice | 01/01/2010 | 16136 | Accounts Receivable | | 131.08 | 134.18 |
| Payment | 01/01/2010 | 061864 | Accounts Receivable | | -131.08 | 3.10 |
| Payment | 01/01/2010 | 061864 | Accounts Receivable | | -131.08 | -127.98 |
| Invoice | 01/02/2010 | 16601 | Accounts Receivable | | 0.00 | -127.98 |
| Invoice | 02/01/2010 | 16283 | Accounts Receivable | | 131.08 | 3.10 |
| Payment | 02/01/2010 | 042533 | Accounts Receivable | | -131.08 | -127.98 |
| Invoice | 03/01/2010 | 16441 | Accounts Receivable | | 131.08 | 3.10 |
| Payment | 03/02/2010 | 045135 | Accounts Receivable | | -131.08 | -127.98 |
| Invoice | 03/15/2010 | FC 213 | Accounts Receivable | | 0.00 | -127.98 |
| Invoice | 03/31/2010 | 16799 | Accounts Receivable | | 131.08 | 3.10 |
| Payment | 04/01/2010 | 052757 | Accounts Receivable | | -131.08 | -127.98 |
| Invoice | 05/01/2010 | 16880 | Accounts Receivable | | 131.08 | 3.10 |
| Payment | 05/01/2010 | 092676 | Accounts Receivable | | -131.08 | -127.98 |
| Invoice | 05/28/2010 | 17238 | Accounts Receivable | | 131.08 | 3.10 |
| Payment | 05/28/2010 | 011904 | Accounts Receivable | | -131.08 | -127.98 |
| Invoice | 06/04/2010 | 17262 | Accounts Receivable | | 161.93 | 33.95 |
| Payment | 06/04/2010 | 016724 | Accounts Receivable | | -161.93 | -127.98 |
| Invoice | 06/24/2010 | 17317 | Accounts Receivable | | 131.08 | 3.10 |
| Payment | 06/29/2010 | 095404 | Accounts Receivable | | -131.08 | -127.98 |
| Invoice | 07/22/2010 | 17472 | Accounts Receivable | | 131.08 | 3.10 |
| Payment | 07/30/2010 | 021617 | Accounts Receivable | | -131.08 | -127.98 |
| Invoice | 08/23/2010 | 17622 | Accounts Receivable | | 131.08 | 3.10 |

**8:08 PM**

**03/24/26**

# Animal Intelligence Software, Inc.
## Customer Balance Detail
### As of March 1, 2011

| Type | Date | Num | Account | Class | Amount | Balance |
|------|------|-----|---------|-------|--------|---------|
| Payment | 08/31/2010 | 013589 | Accounts Receivable | | -131.08 | -127.98 |
| Invoice | 09/17/2010 | 17762 | Accounts Receivable | | 131.08 | 3.10 |
| Payment | 09/30/2010 | 074722 | Accounts Receivable | | -3.10 | 0.00 |
| Invoice | 10/18/2010 | 17914 | Accounts Receivable | | 131.08 | 131.08 |
| Payment | 11/01/2010 | 016445 | Accounts Receivable | | -131.08 | 0.00 |
| Invoice | 11/17/2010 | 18051 | Accounts Receivable | | 131.08 | 131.08 |
| Payment | 11/30/2010 | 007514 | Accounts Receivable | | -131.08 | 0.00 |
| Invoice | 12/17/2010 | 18255 | Accounts Receivable | | 732.60 | 732.60 |
| Invoice | 12/17/2010 | 18372 | Accounts Receivable | | 732.60 | 1,465.20 |
| Payment | 01/03/2011 | 003110 | Accounts Receivable | | -732.60 | 732.60 |
| Invoice | 01/06/2011 | 18285 | Accounts Receivable | | 334.50 | 1,067.10 |
| Payment | 01/06/2011 | 097916 | Accounts Receivable | | -334.50 | 732.60 |
| Invoice | 02/16/2011 | 18310 | Accounts Receivable | | 732.60 | 1,465.20 |
| Payment | 03/01/2011 | 18310 | Accounts Receivable | | -732.60 | 732.60 |

Total #1149 SW Veterinary Dermatology #1149      732.60      732.60

*EXHIBIT F*

Today(19 Aug)

30 minutes ago

Brad Osterman posted a comment to the ticket

Comment TypePrivate

Content

**From:**
Sarah Osborn <sarahcosborn@gmail.com>
**Sent:** Tuesday, August 19, 2025 8:59 AM
**To:** AI Products <aiproducts@animalintelligence.com>
**Subject:** Re: Quote Follow Up

Brad,

Yes, I received it.  We have opted to go with another system.

Thank you for the information,

Sarah Osborn

2 hours ago

Brad Osterman posted a comment to the ticket

Comment TypePrivate

Content

PhoCal: I had called to speak with Dr. Osborn but she was not available and I had left a message.

18 Aug

11:49 AM

Brad Osterman updated a comment in the ticket

Comment TypePrivate

Original Comment

PhoCal: I had called and left a VM f/u to make sure that Dr. Osborn received the quote and that it expires 8/25/25 since the clinic is closed today.

Updated Comment

PhoCal: I had called and left a VM f/u to make sure that Dr. Osborn received the quote and that it expires 8/25/25 since the clinic is closed today. I had also sent a text message to there text number 832-441-0579 for f/u.

11:41 AM

Brad Osterman posted a comment to the ticket

Comment TypePrivate

Content

PhoCal: I had called and left a VM f/u to make sure that Dr. Osborn received the quote and that it expires 8/25/25 since the clinic is closed today.

11:04 AM

Brad Osterman updated a comment in the ticket

Comment Type**Private**

Original Comment

PhoCal: I had contacted Dr. Osborn here. I had let her know that I understand from George that you had contacted about an appointment scheduler or database error. I had let her that I had looked at her account and see that they had cancelled back in 2011 and that AI should have been returned at that time. I had let her know that I had just sent a quote on reinstating AI. I had let her know that the AI 3.x series is not support or sold anymore. I had given verbally the quote information as she said it hasn't come in yet. I had let her knot that it would be beneficial to upgrade and if she declines it, that I would have to let the executive team know.

Updated Comment

PhoCal: I had contacted Dr. Osborn here. I had let her know that I understand from George that you had contacted about an appointment scheduler or database error. I had let her that I had looked at her account and see that they had cancelled back in 2011 and that AI should have been returned at that time. I had let her know that I had just sent a quote on reinstating AI. I had let her know that the AI 3.x series is not support or sold anymore. I had given verbally the quote information as she said it hasn't come in yet. I had let her know that it would be beneficial to upgrade and if she declines it, that I would have to let the executive team know.

11:04 AM

Brad Osterman updated a comment in the ticket

Comment Type**Private**

Original Comment

PhoCal: I had contacted Dr. Osborn here. I had let her know that I understand from George that you had contacted about an appontment scheduler or database error. I had let her that I had looked at her account and see that they had cancelled back in 2011 and that AI should have been returned at that time. I had let her know that I had just sent a quote on reinstating AI. I had let her know that the AI 3.x series is not support or sold anymore. I had given verbally the quote information as she said it hasn't come in yet. I had let her knot that it would be beneficial to upgrade and if she declines it, that I would have to let the executive team know.

Updated Comment

PhoCal: I had contacted Dr. Osborn here. I had let her know that I understand from George that  you had contacted about an appointment scheduler or database error. I had let her that I had looked at her account and see that they had cancelled back in 2011 and that AI should have been returned at that time. I had let her know that I had just sent a quote on reinstating AI. I had let her know that the AI 3.x series is not support or sold anymore. I had given verbally the quote information as she said it hasn't come in yet. I had let her knot that it would be beneficial to upgrade and if she declines it,  that I would have to let the executive team know.

15 Aug
10:50 AM

Brad Osterman posted a comment to the ticket

Comment Type**Private**

Content

PhoCal: I had contacted Dr. Osborn here. I had let her know that I understand from George that you had contacted about an appontment scheduler or database error. I had let her that I had looked at her account and see that they had cancelled back in 2011 and that AI should have been returned at that time. I had let her know that I had just sent a quote on reinstating AI. I had let her know that the AI 3.x series is not support or sold anymore. I had given verbally the quote information as she said it hasn't come in yet. I had let her knot that it would be beneficial to upgrade and if she declines it, that I would have to let the executive team know.

07:51 AM

George Bala updated a comment in the ticket

Comment Type**Private**

Original Comment

Phone call: Able to speak with Dr. Sarah Osborn. Explain to her the cloud Animal Intelligence. Dr. Osborn would just want the scheduler part of AI. Explain to her that the scheduler is part of AI so if she becomes an active client again, she can use the scheduler from AI. Explain to her the cloud AI. Dr. Osborn is checking for an estimate for the cost. Check for how many users: as per her 5 users. Dr. Osborn is asking that if she acquires the cloud AI, can it be SR1 1st then the new one. She provided an email to where we can send the cost, informed her that I can include the website so she would know how much it would be per 5 users. (sarahcosborn@gmail.com). Before ending the call, explain to Sarah that the scheduler is part of AI so she would be acquireing a new AI cloud account support with the scheduler (She understood). EOC.

Updated Comment

Phone call: Able to speak with Dr. Sarah Osborn. Explain to her the cloud Animal Intelligence. Dr. Osborn would just want the scheduler part of AI. Explain to her that the scheduler is part of AI so if she becomes an active client again, she can use the scheduler from AI. Explain to her the cloud AI. Dr. Osborn is checking for an estimate for the cost. Check for how many users: as per her 5 users. Dr. Osborn is asking that if she acquires the cloud AI, can it be SR1 1st then the new one. She provided an email to where we can send the cost, informed her that I can include the website so she would know how much it would be per 5 users. (sarahcosborn@gmail.com). Before ending the call, explain to Sarah that the scheduler is part of AI so she would be acquiring a new AI cloud account support with the scheduler (She understood). EOC.

07:38 AM

George Bala posted a comment to the ticket

Comment TypePrivate

Content

Phone call: Able to speak with Dr. Sarah Osborn. Explain to her the cloud Animal Intelligence. Dr. Osborn would just want the scheduler part of AI. Explain to her that the scheduler is part of AI so if she becomes an active client again, she can use the scheduler from AI. Explain to her the cloud AI. Dr. Osborn is checking for an estimate for the cost. Check for how many users: as per her 5 users. Dr. Osborn is asking that if she acquires the cloud AI, can it be SR1 1st then the new one. She provided an email to where we can send the cost, informed her that I can include the website so she would know how much it would be per 5 users. (sarahcosborn@gmail.com). Before ending the call, explain to Sarah that the scheduler is part of AI so she would be acquireing a new AI cloud account support with the scheduler (She understood). EOC.

07:35 AM

Brad Osterman posted a comment to the ticket

Comment TypePrivate

Content

If Dr. Osborn wants any support, she would need to be an active client again. Which there would a cost to becoming a client again. Only once she became a client again is when we would provide any support.

07:24 AM

Brad Osterman posted a comment to the ticket

Comment TypePrivate

Content

First before handling any clinic issues need to find them in the Zoho Desk to make sure that they are an active clinic. Please make sure that a clinic is active before handling any support issues by remoting into their system. Dr. Osborn here is not an active clinic and we cannot provide any support to them. She had cancelled AI a long time ago, that is why you don't see her here in Zoho. In order for her to get any support, she would have to become an active client again.

You cannot remote into their system and provide any support to them.

If Dr. Osborn wants any support, she needs to be an active client. Any clinic that has cancelled the use of AIS and using AI improperly cannot receive any support since they are not an active client.
07:24 AM

George Bala updated a comment in the ticket

Comment TypePrivate
Original Comment

Phone call: 12818948151: Able to speak with Sarah, as per her their current AI is 3.00 SR1. As per her they are expeirencing error 7017 problem with advantage server. As per her the server was updated. Upon checking, they are not in the CRM. Sarah is claiming that their AI is working except for the scehduler and they would like to know how much would it cost so they can have the scheduler working again. Explain to Sarah the the cloud upgrade. As per her, she is planning to sell the practice and would leave it to them.

Updated Comment

Phone call: 12818948151: Able to speak with Sarah, as per her their current AI is 3.00 SR1. As per her they are expeirencing error 7017 problem with advantage server. As per her the server was updated. Upon checking, they are not in the CRM. Sarah is claiming that their AI is working except for the scehduler and they would like to know how much would it cost so they can have the scheduler working again. Explain to Sarah the the cloud AI. As per her, she is planning to sell the practice and would leave it to them.

07:23 AM

George Bala updated a comment in the ticket

Comment TypePrivate
Original Comment

Phone call: 12818948151: Able to speak with Sarah, as per her their current AI is 3.00 SR1. As per her they are expeirencing error 7017 problem with advantage server. As per her the server was updated. Verify if we can remote in to the server. As per Sarah they would need to speak with their IT first. Provide information for upgrading to the cloud: As per Sarah, she is planning to sell the practice and would leave it to them if they want to continue.

Updated Comment

Phone call: 12818948151: Able to speak with Sarah, as per her their current AI is 3.00 SR1. As per her they are expeirencing error 7017 problem with advantage server. As per her the server was updated. Upon checking, they are not in the CRM. Sarah is claiming that their AI is working except for the scehduler and they would like to know how much would it cost so they can have the scheduler working again. Explain to Sarah the the cloud upgrade. As per her, she is planning to sell the practice and would leave it to them.

07:08 AM

George Bala posted a comment to the ticket

Comment TypePrivate
Content

Phone call: 12818948151: Able to speak with Sarah, as per her their current AI is 3.00 SR1. As per her they are expeirencing error 7017 problem with advantage server. As per her the server was updated. Verify if we can remote in to the server. As per Sarah they would need to speak with their IT first. Provide information for upgrading to the cloud: As per Sarah, she is planning to sell the practice and would leave it to them if they want to continue.

06:49 AM

Brad Osterman updated a comment in the ticket

Comment TypePrivate
Original Comment
**Call ID:** 295718668
**Call Duration:** 00h 01m 30s
**Date & Time:** 15th Aug 2025, 06:47am
**Call from:** New JustCall Contact ( +12818948151 )
**Received on:** AI Voice Agent 1 ( +15093317587 )
**Assigned To:** Brad Osterman
**Call Recording:** https://ruzg4.app.goo.gl/M4Wyjo
**Call Info:** https://ruzg4.app.goo.gl/sMwxiC

Updated Comment
**Call ID:** 295718668
**Call Duration:** 00h 01m 30s
**Date & Time:** 15th Aug 2025, 06:47am
**Call from:** New JustCall Contact ( +12818948151 )
**Received on:** AI Voice Agent 1 ( +15093317587 )
**Assigned To:** Brad Osterman
**Call Recording:** https://ruzg4.app.goo.gl/M4Wyjo
**Call Outcome (Disposition):**
**Notes:** AI Voice Agent Notes:
Caller Name: Sarah Osborne
Reason for Calling: Question regarding an error code
Call Summary: 1. Caller is Sarah Osborne
2. Calling from Southwest Veterinary Dermatology
3. Requesting to speak to a representative about an error code

06:49 AM

Brad Osterman posted a comment to the ticket

Comment TypePrivate
Content
**Call ID:** 295718668
**Call Duration:** 00h 01m 30s
**Date & Time:** 15th Aug 2025, 06:47am
**Call from:** New JustCall Contact ( +12818948151 )
**Received on:** AI Voice Agent 1 ( +15093317587 )
**Assigned To:** Brad Osterman
**Call Recording:** https://ruzg4.app.goo.gl/M4Wyjo

**Call Info:** https://ruzg4.app.goo.gl/sMwxiC

06:49 AM
## Ticket language was detected

LayoutSupport
06:49 AM
## Brad Osterman submitted a new ticket

DepartmentSupport
Contact NameNew JustCall Contact
SubjectIncoming Call (Answered)
StatusOpen
ChannelPhone
LayoutSupport
Relationship TypeNone

*EXHIBIT G*

──────────────────────────────────── **Last read** ────────────────────────────────────

Brad O



Call Information

| Date & Time | 2026-01-07 08:49:17 |
| Direction | Incoming |
| Duration | 03:37 |
| Status | completed |
| JustCall number | (360) 777-6374 |
| Client number | (281) 401-8300 (New JustCall Contact) |

Here's the information from the ticket that was created
**Call ID:** 335083206
**Call Duration:** 00h 09m 04s
**Date & Time:** 7th Jan 2026, 08:44am
**Call from:** New JustCall Contact ( +12814018300 )
**Received on:** AI Voice Agent 1 ( +15093317587 )
**Assigned To:** Brad Osterman
**Call Recording:** https://bifrost.justcall.io/voice-tools-calling/v1/recording/get-presigned-url?recSid=CA6601d87d6dc...
**Notes:** AI Voice Agent Notes: Caller Name: Brandon Whiting Reason for Calling: Need to find out how to release licenses Call Summary: 1. Caller needs assistance with license release 2. Error code 7003 appears when launching N1 Intelligence 3. Requires admin password for support 4. Request to transfer to live support

 Gmail

Shannon Driver <sedriver22@gmail.com>

**Dr. Osborn at Southwest Veterinary Dermatology**
2 messages

**Brad Osterman** <bosterman@animalintelligence.com>                                    Wed, Jan 7, 2026 at 12:08 PM
To: Thomas Driver <aisdrd@gmail.com>, Shannon Driver <sedriver22@gmail.com>, S Eileen Sullivan <esullivanacctgservices@gmail.com>

Dr. D,

Brandon (IT with Centric Technology Services) called from Southwest Veterinary Dermatology into support today about an issues with Licenses where a message was coming up about licenses are used up when only 4 out of the 5 licenses he said were being used. In getting the information from him, this is again a call from Dr. Sarah Osborn clinic. I had let Brandon know that the clinic had cancelled and that they should not be using AI. That I would not be able to provide any support. Brandon asked what the fee would be to reestablish support. I had let Brandon know that Dr. Osborn had contacted us last year about an error and we had sent to a quote on upgrading and getting back onto support legally. That from that she had said that did not want to move forward and that she wasn't using our software. That I would have to reach out to the Executive team here on what would be the next steps moving forward here on getting back onto support or something else here.

On August 19th, 2025, she had responded to our Quote email follow up stating that they have opted to go with another system. Based on the call today from Brandon, Dr. Osborn is still using the software in her practice. I've included below a link to the JustCall here with Brandon: https://app.justcall.io/calls/ CA78e1794741480a41a50718ebd17c8877

Thanks,
Brad

**Shannon Driver** <sedriver22@gmail.com>                                    Wed, Jan 7, 2026 at 3:21 PM
To: Brad Osterman <bosterman@animalintelligence.com>
Cc: Thomas Driver <aisdrd@gmail.com>, S Eileen Sullivan <esullivanacctgservices@gmail.com>

Brad,
Thanks. Received.

Kindest regards,
Shannon
Direct line: 360.620.5933

[Quoted text hidden]

*EXHIBIT H*



BECKI L. WHEELER
*bwheeler@workwith.com*
509.239.5520

August 31, 2025

Dr. Sarah Osborn, DVM
Southwest Veterinary Dermatology
18807 State Highway 249
Houston, TX 77070
sarahcosborn@gmail.com

***Sent Via Email to***

     *Re:   Unauthorized use of Animal Intelligence Software*

Dear Dr. Osborn:

My office represents Animal Intelligence Software, Inc. ("AIS") and specifically related to your unauthorized use of Animal Intelligence Software. As you are aware, you signed a contract with AIS on October 20, 2004, granting you a non-transferable, limited license to install and use the Animal Intelligence Software on up to five (5) workstations. Per the terms of the contract, the license was valid only during the existence of the contract and conditioned upon payment of ongoing support and maintenance fees.

On January 19, 2011, you notified AIS in writing that you were cancelling support, citing price concerns and dissatisfaction with contractual changes. (*please see writing attached as Exhibit A*) Per that request for cancellation, you were provided notice that cancellation triggers license termination and required you to remove all AIS software. AIS received your final payment on March 1, 2011 and after that, there was no reinstatement of support or license for use.

On August 15, 2025, you placed a support call to AIS regarding a technical issue with version AI 3.0, specifically, error codes and functionality of the scheduler module. During that call you confirmed use of AI 3.00 SR1 on five (5) workstations, requesting assistance and exploring options for system upgrade or reinstatement. Support staff notified you that continued use was unauthorized following the 2011 termination and issued a quote for reinstatement and upgrade. You declined reinstatement and communicated you'd be transitioning to a different system.

A PROFESSIONAL LIMITED LIABILITY COMPANY
601 West Main Avenue, Suite 1400
Spokane, Washington 99201-0677
Telephone: (509) 455-9077
Facsimile: (509) 624-6441
Toll Free: (866) 903-9912
www.workwith.com

Your unauthorized use of the AI software has exposed you to several legal claims. You have breached the contractual agreement you had with AIS. According to Section 1(b) of the software license, upon termination or expiration of the contract, the client must "promptly return to AIS all full or partial copies of the Software and related material." Appendix A of the contract states, clients declining to pay monthly support "will not be supported" and must follow protocols for software removal and license termination. Not only did you fail to return AIS software and related material, but you continued to utilize the product without paying for it.

You have also committed copyright infringement. The unauthorized retention and use of the proprietary AI software, without a valid license or support contract, constitutes a violation of copyright law. Since your unauthorized use was deliberate, willful and persistent, despite multiple explanations of the license terms over the years, there are statutory penalties that can be as high as $150,000. In addition to the statutory penalties, my client is entitled to loss income from the breach. Due to your infringement, they have lost $63,567.82 in loss of support revenue, $22,500 in upgrade fees, between $750-$150,000 in statutory damages for willful infringement and attorney fees and costs.

In order to avoid costly litigation, my client is willing to accept $100,000 at this time. If you have any questions or require further clarification, please do not hesitate to reach out. Thank you for your attention to this matter. We look forward to your prompt response and cooperation as this offer will be open until September 15, 2025.

Sincerely,

WITHERSPOON BRAJCICH MCPHEE, PLLC

BECKI L. WHEELER

*EXHIBIT I*

 Gmail

**Shannon Driver <sedriver22@gmail.com>**

## Response
2 messages

**Becki L. Wheeler** <bwheeler@workwith.com>                                    Mon, Sep 29, 2025 at 7:37 PM
To: Shannon Driver <sedriver22@gmail.com>, Thomas Driver <aisdrd@gmail.com>

Doc and Shannon,  I received the below response from Dr. Osborn.  Let me know if you want me to reach out to her attorney prior to drafting suit.

Ms. Becki L. Wheeler
WBM
601 West Main Avenue, Suite 1400
Spokane, Washington 99201-0677
bwheeler@workwith.com

Re: Unauthorized use of Animal Intelligence Software

Ms. Wheeler,

Regarding your letter emailed to me September 2, 2025, I disagree with your comments on my unauthorized use of Animal Intelligence Software (AIS).

You mention that AIS has notified me that cancellation of support triggers license termination and requires removal of all AIS software. I have never received any notification from AIS stating this as it relates to my existing contract.

I signed a contract with AIS on October 20, 2004, and have not violated any of the terms of the signed agreement. Specifically, related to software use being conditioned upon payment of ongoing support and maintenance fees. The signed contract does not mention that declining monthly support requires license termination and the requirement to remove all AIS software. In fact, Page 11 (Section 2, third paragraph) of my signed contract states: "AI Clients who decline to pay monthly support fees on the Software will not be supported." Additionally, Page 12, (Section b) states that any clients who have not contracted for support for over one year must pay a reinstatement fee which includes all back support fees up to one year from termination. This implies that the software can continue to be used per the signed contract without paying for support.

The violations that you are referring to are from a new contract from AIS, dated December 17, 2010, renaming AI Support and Maintenance fees to AI License and Support fees. The intention of the new contract was to change my existing contract agreement to indicate that failure to pay software license and support fees can terminate the rights of the licensee to use AIS. The new contract also included an 87% increase in support fees in one year. I did not agree to these changes and never signed the new contract.

My letter to AIS dated January 19, 2011, clearly states my opposition to these changes. You simply cannot bind me to a revised contract that I never signed.

Any further communication on this matter will be forwarded to my attorney's office in Houston, Nance & Simpson, LLP.

Dr. Sarah Colombini Osborn, DVM
Southwest Veterinary Dermatology


*Becki L. Wheeler*
Witherspoon Brajcich McPhee, PLLC

601 W. Main Avenue, Suite 1400
Spokane, Washington 99201
Direct: (509) 239-5520
Office: (509) 455-9077
Fax: (509) 624-6441

  



*This message may contain confidential or privileged information.  If you are not the intended recipient, please notify me immediately and delete all copies from your servers.*



ATTORNEY-CLIENT PRIVILEGED COMMUNICATION